JOHN W. ANDERSON, as Assignee, etc., Respondent *v.* CLEMENT READ et al., Appellants.

The word "sold" in a contract of sale of chattels does not necessarily import an executed contract.

Where, by the terms of the contract, some material act remains to be done by the vendor before he can insist upon making delivery or can claim payment, such word is to be construed as meaning "contracted to sell," and the contract is merely an executory one.

So, also, where the contract contains no specification, identification, description or appropriation of the particular property, no title passes to the vendee; in order to pass the title the article, if not delivered, must be in some manner designated so that possession can be taken by the purchaser without any further act on the part of the vendor.

Defendants' firm entered into a contract with the firm of R. W. L. R. & Co., which stated that the former had "sold" to the latter a specified quantity of "ammoniated superphosphates" at a price specified, to be paid for "on delivery to buyers of bills of lading, by their notes." The vendors guaranteed the goods to be of a specified quality, the sampling and analysis to be made by certain persons named; shipments to be made during the month of December, 1881. The purchasers had pre-viously contracted to sell to one De L. a larger amount of the same general kind of fertilizer, he agreed to accept the goods purchased of defendants to apply upon his contract. Defendants, with knowledge that R. & Co. had made such contract with De L., and desired the goods to make delivery under that contract, accepted an order, drawn on and presented to them by R. & Co., requiring them to deliver the goods "sold to" R. & Co. to De L., and also delivered to R. & Co. a memorandum stating they would deliver to De L. on said order, on vessels to be furnished by him, the last delivery to be made the last of December or early in January, 1882. R. & Co. gave their notes as agreed for the purchase-price. The goods were not in fact manu-factured at this time. On receipt of the order and memorandum De L. gave his own notes and the acceptances of third persons to R. & Co. in payment for the goods. R. & Co. soon after stopped payment and made an assignment for the benefit of creditors. Defendants refused to deliver the goods under the order unless they were paid

the purchase-price, and offered to surrender the notes received by them. In an action upon the contract to recover the value of the goods, *held* (RUGER, Ch. J., ANDREWS and DANFORTH, JJ., dissenting), that it was an executory, not an executed, contract, and so passed no title to the goods specified; that the subsequent transactions between the parties did not transform said contract into an executed one; that the delivery of the order to De L. vested no right of property in him, but simply amounted to an assignment to him of the rights of R. & Co. under the contract, and inasmuch as against R. & Co., defendants had the right to refuse to deliver the goods without payment therefor, after that firm became insolvent, they had the same right as against De L. or his assignee.

Also *held* (RUGER, Ch. J., ANDREWS and DANFORTH, JJ., dissenting), that defendants were not estopped from showing the fact that no title passed, or from denying the legal right of plaintiff, as assignee of De L., to a delivery of goods of the same character and quality as described.

Also *held* (RUGER, Ch. J., ANDREWS and DANFORTH, JJ., dissenting), that the question was one of law for the trial court, and that a submission thereof to the jury was error.

*Kimberly* v. *Patchin* (19 N. Y. 330); *Briggs* v. *Sizer* (30 id. 647); *Knights* v. *Wiffen* (L. R., 5 Q. B. 660) distinguished.

(Argued January 24, 1887 ; decided October 4, 1887.)

APPEAL from judgment of the General Term of the Superior Court of the city of New York, entered upon an order made March 21, 1885, which affirmed a judgment in favor of plaintiff entered upon a verdict.

This action was brought by plaintiff, as assignee for the benefit of creditors of one P. M. De Leon, to recover damages for the non-delivery of the goods mentioned in the instrument set forth in the opinion, wherein, also, all the material facts are stated.

*Algernon S. Sullivan* for appellants. The contract entered into between Raisin & Co. and the defendants on the 7th day of December, 1881, was an executory contract of sale. (2 Kent [10th ed.], 641; Story on Sales, § 233; 4 Benj. on Sales, § 310, *n.* [Corbin's ed.]; Blackb. on Sales, 120; Chitty on Cont. [11th Am. ed.], 524, 525; 1 Benj. on Sales [Corbin's ed.],

§ 462; *Kimberly* v. *Patchin,* 19 N. Y. 332; *Foote* v. *Marsh,* 51 id. 288; *Higgin* v. *D., L. & W. R. R. Co.,* 60 id. 558; *Cook* v. *Millard,* 65 id. 356; *Merch. Nat. B'k* v. *Bangs,* 102 Mass. 295; *McConihe* v. *N. Y. & E. R. R. Co.,* 20 N. Y. 495, 497; *Andrews* v. *Durant,* 11 id. 35; *Kelly* v. *Upton,* 5 Duer, 336, 340; 3 id. 309; Benj. on Sales [Corbin's ed.], § 311; *Harff* v. *Hines,* 40 N. J. L. 585, 586; *Ormsby* v. *Machlin,* 20 Ohio St. 295; *May* v. *Hooglan,* 9 Bush [Ky.], 171.) For a refusal on the part of Read & Co. to deliver under this executory contract, Raisin & Co.'s only remedy would be an action at law to recover damages for breach of contract; but, in such an action, Raisin & Co. cannot recover without actual payment, they having become insolvent before time of delivery. (Story on Sales, § 452; Benj. on Sales [Corbin's ed.] § 1305; id. 897, *n.* 23.) Even if it were established that the plaintiff was the assignee of Raisin's contract, he must have taken the same, subject to all equities that might be invoked against Raisin & Co. (Willard's Eq. 462; *Bush* v. *Lathrop,* 22 N.Y. 535; Chitty on Cont. [11th Am. ed.], 1366.) There was no direct privity of contract between defendants and De Leon. (*Simonson* v. *Brown,* 68 N. Y. 355; *Austin* v. *Seligman,* Daily Reg. Nov., 1883; *Rogers* v. *Union Stone Co.,* 130 Mass. 583; *Lawrence* v. *Fox,* 20 N. Y. 268; *Garnsey* v. *Rogers,* 47 id. 233; *R. E. T. Co.* v. *Balch,* 45 id. 532; *Pardee* v. *Treat,* 82 id. 392.) Even if the sale were an executed one, Read & Co., as unpaid vendors, would have a lien upon the goods for the price. (Story on Sales, § 281; *Milliken* v. *Warren,* 57 Me. 46; 5 Denio, 630; *Grice* v. *Richardson,* L. R. 3 App. Cas. 319; *Arnold* v. *Delano,* 4 Cush. 33; *Pardee* v. *Kanady,* 100 N. Y. 121; *N. E. I. Co.* v. *Gilb. E. R. R. Co.,* 91 id. 153; Benj. on Sales [3d Am. Ed.], § 759; Add. on Cont. [Am. Ed.], § 471; *Freeth* v. *Burr,* L. R, 96 C. P. 208; *Bloomer* v. *Bernstein,* id. 588.) By the delivery of the "order" and "memorandum" men‐ tioned in the complaint, the property in the goods did not pass to De Leon and Read & Co's lien, as unpaid vendors, was not divested thereby. These papers are not *indicia* or documents

of title; they are not *quasi* negotiable. (*Collins* v. *Ralli*, 20 Hun, 252; *Hentz* v. *Miller*, 94 N. Y. 64; *Ackerman* v. *Humphrey*, 7 M. & G. 678; *McEwan* v. *Smith*, 2 H. L. C. 309; *Farmeloe* v. *Bain*, 1 C. P. Div. 445; *Farina* v. *Home*, 16 M. & W. 119; Story on Sales, §§ 289, 344; *Imp. Bk.* v. *L. & St. Kitts D. Co.*, 5 Ch. Div. 200; Benj. on Sales [Corb. ed.], §§ 1212, 1214; Benj. on Sales, § 1225; Dan. on Neg. Instr., § 1713; *Lickbarrow* v. *Mason*, 2 Term R. 63; *Rogers* v. *U. Stone Co.*, 130 Mass. 583; *Gushee* v. *Eddy*, 11 Gray, 502; *Sears* v. *Lawrence*, 15 id. 267.) The doctrine of estoppel cannot be invoked against the defendants. (Bigelow on Estop. [2d ed.] 437, 438; *White* v. *Ashton*, 51 N. Y. 280; *Musgrave* v. *Sherwood*, 54 How. Pr. 339; 6 Wait's Action & D., 684; *Furmeloe* v. *Bain*, 1 C. P. Div. 445; *McEwan* v. *Smith*, 2 H. L. C. 309; *Rogers* v. *U. Stone Co.*, 130 Mass. 581; *Gunn* v. *Bolkow*, 10 Ch. 491; Benj. on Sales [Corb. ed.], §§ 1153, 1212; *Woodley* v. *Coventry*, 2 H. & C. 164; *Knights* v. *Whiffin*, L. R. 5 Q. B. 660; *Pearson* v. *Dawson*, El. B. & E. 447; *Briggs* v. *Sizer*, 30 N. Y. 650; *Voorhees* v. *Olmstead*, 66 id. 113.) Raisin & Co. were guilty of fraud in making the original contract, and defendants were thereby entitled to avoid it. (*Cary* v. *Hotailing*, 1 Hill, 311; *De Graw* v. *Elmore*, 50 N. Y. 1.)

*E. Louis Low* for respondent. Read & Co.'s agreement with Raisin & Co. was an executed contract. (*B'k of Rochester* v. *Jones*, 4 N. Y. 503; 2 Starkie on Ev., pt. 2, p. 1221; *Dox* v. *Day*, 3 Wend. 357.) When third parties, who, like De Leon, may have been deceived, to their detriment, by the expression "sold," through the fault of the seller, the latter should be estopped from claiming a different signification. (*Kelly* v. *Upton*, 5 Duer, 336; Benj. on Sales [Corb. Ed.], § 311.) The delivery order vested title in De Leon. (Benj. on Sales [4th Am. Ed., Bennet], § 814 *et seq.*; § 823; *McNeil* v. *Hill*, Woolworth C. C. R. 96; *Allen & Co.* v. *Maury & Co.*, 66 Ala. 18; *Chirardelli* v. *McDermott*, 22

Cal. 539; *Davis* v. *Russell,* 52 id. 611; *How* v. *Barker,* 8 id. 613; *Wailes & Co.* v. *Couch,* 75 Ala. 134; *Merch. B'k of Detroit* v. *Hibbard,* 48 Mich. 118; *Briggs* v. *Sizer,* 30 N. Y. 647; Benj. on Sales, 934, § 817; Addison on Cont. 959, 486 [8th ed. Am. N. by Abbott]; *Hemmingway* v. *Poucher,* 98 N. Y. 281; *Pearson* v. *Dawson,* 27 L. J. Q. B. 248; *Knights* v. *Wiffen,* L. R. 5 Q. B. 660; *Voorhis* v. *Olmstead,* 66 N. Y. 113; *Woodley* v. *Coventry,* L. J., 1863, Causes at Common Law, 32 N. S. pt. 2, p. 185; *S. C.,* 2 H. & C. 164; *Hunn* v. *Bowne,* 2 Caine, 38.) Defendants are estopped. (*Knights* v. *Wiffen.* L. R. 5 Q. B. 660; *Woodley* v. *Coventry,* 32 N. S. L. J., 1863, Causes at Common Law; *Hunn* v. *Bowne,* 2 Caine, 38; *Heuertematte* v. *Morris,* 101 N. Y. 70 · *Victor* v. *In. Nav. Co.,* 13 J. & S. 142; *Cont. Nat. B'k* v. *Nat. B'k of Comm.,* 50 N. Y. 575; Bigelow on Est. [4th ed. 1886], 553; *Pearson* v. *Dawson,* 27 L. R. Q. B. 248; *Knights* v. *Wiffen,* L. R. 5 Q. B. 660; *Woodley* v. *Coventry,* L. R., 1863, etc., 185; *Hunn* v. *Bowne,* 2 Caine, 38; *McNeil* v. *Hill,* Woolworth's C. C. 96.) When the seller undertakes to sell and deliver goods he cannot defend by showing outside of his contract that the goods were not actually segregated or set aside, and the title passes to the vendee without such segregation. (*Kimberly* v. *Patchin,* 19 N. Y. 330; *Russell* v. *Carrington,* 42 id. 118; *Merch. B'k of Detroit* v. *Hibbard,* 48 Mich. 118; *Woodley* v. *Coventry,* 2 H. & C. 164; *Knights* v. *Wiffen,* L. R. 5 Q. B. 660.)

PECKHAM, J. Prior to and at the time of the transactions in question in this action, the firm of Rasin & Co. was engaged in business in the city of Baltimore as manufacturers and sellers of fertilizers, and the defendants as partners, and one Perry M. De Leon, individually, were engaged in the same business in the city of New York. On or about the 7th day of December, 1881, one of the members of the defendants' firm and an agent or member of the firm of Rasin & Co., met in the city of Atlanta, in the State of Georgia, and signed a contract, of which what follows is a copy:

"MARKHAM HOUSE,
"W. A. HUFF, *Proprietor.*
"ATLANTA, Ga., *December* 7, 1881.

"We have to-day sold to Messrs. R. W. L. Rasin & Co., of Baltimore, Md., one thousand tons ammoniated superphosphates, at twenty-four ($24) dollars per ton (2,000 lbs.), on a cash basis, goods to be delivered free on board buyers' vessels, and by us in bulk. We guarantee the analysis of the goods to be not less than two per cent of ammonia, and not less than eight per cent of available phosphoric acid; sampling and analysis of each shipment to be made by A. R. D. Dane & Co., of New York, or by Prof. White, of Georgia. Settlements are to be made on delivery to buyers of bills of lading by their notes, with six per cent interest added. For the convenience of sellers, buyers agree to make their notes at four months, with the understanding that they are to be renewed so as to mature finally not later than December 10 and December 20, 1882, say one-half each date. Shipment to be made as early as possible during this month.

"READ & CO., *of New York.*"

"We accept the above.

"R. W. L. RASIN & CO., *Baltimore, Md.*"

"Messrs. Read & Co. have the option of furnishing an additional one thousand tons on above terms, within twenty days from this date."

This contract, or a duplicate, was received by the respective firms, through the mail, by the ninth of December following its execution in Atlanta.

After the execution of the contract, one of the members of the firm of Rasin & Co. came to New York. He had heard of its execution through a telegram, but the contract had not arrived by mail before he left. On Friday, December ninth, he went to see De Leon in New York. His firm had, in the previous September, contracted to deliver to De Leon two thousand tons of this same general kind of fertilizer

deliverable in November and December, 1881, and January, 1882, and they had delivered but three hundred tons, and were unable to deliver more, owing, as Rasin said, to the burning of his factory, but probably because of the pecuniary condition of the firm. At his interview with De Leon on the ninth, he says that he then offered to make a delivery to De Leon on their contract by delivering to him the one thousand tons which he was to obtain from the defendants under his contract with them; that De Leon objected, but finally consented on his promising to substitute, if possible, before the actual delivery of the goods, those which were of his (Rasin's) own manufacture. Rasin was to give an order on defendants, which was to be accepted by them.

The next day Rasin called on defendants and had an interview with one of the firm at their office. Rasin testified that he asked Read if he knew of the contract made at Atlanta for the 1,000 tons; he said he did. He was then asked if he knew why they (Rasin & Co.) had made that purchase; he said yes, he understood Rasin & Co. were in a hole and that they had purchased the 1,000 tons to get out. Rasin said that was a fact; that De Leon was pressing them for a delivery of goods to him at once, and he, Rasin, was ready to comply with his agreement with them (defendants); that they should have the notes drawn up to suit themselves, such time as would best suit their convenience to have them discounted. Read said it was all satisfactory, and he had the notes drawn. Rasin also said to Read that as these goods were purchased to relieve them to some extent on their outstanding contract, and, as he proposed to deliver those goods to De Leon, he would request Read's firm to accept an order in favor of De Leon to that effect; and, as there had been more or less trouble about the delivery and shipment of goods, which, in this case, he wished to avoid, he also requested Read & Co. to give him a memorandum of the time it would be convenient for them to deliver him these goods, that he might take it to De Leon. Rasin then produced a paper as follows:       .

"BALTIMORE, *December* 9, 1881.
"Mess. READ & Co., 34 *Beaver street, N. Y.*

"GENTLEMEN.— Please deliver to P. M. De Leon one thousand tons of ammoniated superphosphates sold to us, and oblige,
          "Very respectfully,
                    "R. W. L. RASIN & CO."
"Accepted.
          "READ & CO."

This whole paper is in the handwriting of Rasin, with the exception of the signature "Read & Co." which is written after the word "Accepted" and across the face of the order.

After Read & Co. had signed this order, and upon the request, as above stated of Rasin, the following memorandum was signed by Read & Co:

          "Memorandum.
"To Messrs. R. W. L. RASIN & Co., *Baltimore, Md.*
"From READ & Co.,

          "34 *Beaver street, New York, December* 10, 1881.

"DEAR SIR.—We will deliver to Mr. P. M. De Leon on your order, dated Dec. 7th, accepted by us to-day, one cargo, say 500 tons to vessel, to begin loading about the 19th December, and the remainder of the 1,000 tons to a vessel to load the latter part of December or early in January, 1882, vessels to be furnished by Mr. De Leon.
                    "READ & CO."

The date of December seventh in above memorandum refers to the order of Rasin & Co. on defendants, and which is really dated December ninth as stated, though the figure in the original is said to look like a figure seven.

The account of this interview given by Mr. Read does not materially differ from Mr. Rasin's. Mr. Read said that Mr. Rasin called upon him at his office and told him he had sold more goods than he could deliver, and that he wanted this 1,000 tons to deliver to De Leon. Read said he saw no objection to his doing so and Rasin then pulled out of his pocket the order above set forth, handed it to Read and asked

him to sign it. Read read it, and in the end signed it by writing the name of the firm across the face thereof as accepted. Read says Rasin said nothing about what was to be done with it. In response to a request from Rasin for a prompt delivery Read said he saw no reason why they should not deliver them early, that they had not got the goods made but they had the stock in the factory and it would take them but a few days to make up the goods. (On the trial Read testified that they had no such goods on hand when the Atlanta contract was executed.) Rasin then asked for the memorandum as to delivery, which Read then wrote out, signed and gave to him. He supposed that Rasin would give them (the order and memorandum) to De Leon if he did not change his mind. Read also says he accepted this order and signed the memorandum in order to carry out his contract with Rasin & Co. Rasin then took the order and memorandum to De Leon, who thereupon gave him his own notes for about $12,000, and the acceptances of third parties for about the same amount in payment for the goods which he thus purchased from Rasin & Co. The acceptances were subsequently paid, but the notes given by De Leon were not.

On Monday, December twelfth, Rasin went back to Baltimore, and about the fifteenth of December, a clerk of De Leon called at Read's office, as he says, to learn where the boat should be sent when the goods were manufactured, to be delivered on this accepted order. Read & Co., in the meantime had learned some things which caused them to look with suspicion on the whole transaction, and the result was that they refused to deliver the goods, and notified De Leon of their determination and told him not to attempt to negotiate the order. The ground alleged was that the sale to Rasin & Co. was procured by fraud, and that De Leon was a party to it, and the order and writing on it was a part of the fraud. This notification was subsequently served on plaintiff, the assignee of De Leon, who made an assignment for the benefit of his creditors soon after this transaction. On Thursday, December fifteenth, Rasin & Co. stopped payment,

and on the following day made an assignment for the benefit of their creditors.

The defendants refused to deliver the goods to the assignee of De Leon under the order above mentioned unless they were paid the purchase-price of the same, and offered to surrender the notes of Rasin & Co., which they had given pursuant to the terms of sale of the Atlanta contract, upon such payment.

The assignee of De Leon commenced this action against defendants, claiming to recover from them the value of the goods which the defendants had refused to deliver, with the costs of the action.

The answer of defendants denied any knowledge or information, etc., as to any of the transactions between Rasin & Co. and De Leon, and also set up fraud in the making of the orignal contract of sale on the part of Rasin & Co. in representations as to their pecuniary condition, etc., and alleged that they had received no consideration for the order accepted by them, and that they had never been paid for the goods; also that De Leon knew Rasin & Co. were insolvent when they made the Atlanta agreement, and that he was himself in an insolvent condition and knew the fact when this order was obtained, and that he failed within six days thereafter.

Upon the trial evidence was given upon the subjects above set forth. It was there much mooted as to the character of the Atlanta contract, whether it was an executed or an executory one; whether, in other words, title to 1,000 tons of fertilizer passed from defendants to Rasin & Co. by the execution of that contract.

The learned judge who tried the case charged the jury "that this is an executed contract of sale." He further said:

In the dealing between Rasin and De Leon this, I think, appears, to which I will call your attention. That De Leon said he would give the notes on condition of getting the delivery order signed by Read & Co. What did De Leon mean by that? If you find, gentlemen, any aid in the evidence to guide you to a conclusion on that subject, ascer-

tain if you can whether De Leon expected that he would get the actual possession and delivery of these goods, or did he expect that he would receive a paper giving him the right to the delivery, subject to the vendor's lien? That question, gentlemen, is for you, and is one of the questions that specially lead up to the conclusion." Again: "If you believe, gentlemen, that Mr. Read thought when that paper was signed by him for the purpose of being delivered to Mr. De Leon that it would lead Mr. De Leon to the opinion that he was to have the ownership of these goods on the day mentioned in that paper, in the letter for the delivery of them, and that that possession was not to be interfered with by any claim on the part of Messrs. Read for their vendor's lien, why then, gentlemen, you will say so by your verdict. If you believe that that paper was meant to convey the effect on Mr. De Leon's mind that he was to have the possession of the articles in question free from the vendor's lien, and that Messrs. Read, in signing that paper, intended to convey that fact upon De Leon's mind, you will find a verdict for the plaintiff. If, on the other hand, you believe that Messrs. Read, in signing that paper, intended to reserve their vendor's lien, and had no intention whatever to convey any other idea to Mr. De Leon, then, gentlemen, you will find for the defense."

Exceptions were duly taken to the charge as above given. The court also charged that if entitled to anything the plaintiff was entitled to receive the full value of the property at the time it should have been delivered under the contract. The defendants also duly excepted to such charge. The jury returned a verdict of $27,337.90 for the plaintiff upon which judgment was entered, which was affirmed at the General Term of the Superior Court, and from which judgment of affirmance the defendants have appealed here.

In the argument here the learned counsel for the plaintiff sought to maintain his right to recover upon two different and distinct propositions, the first being that the Atlanta contract was an executed one after payment had been made by the delivery of the notes of Rasin & Co. to the defendants

and accepted by them, as (he claimed), nothing remained to be done but to deliver the goods of the quality and at the time agreed upon, and that the delivery order accepted by Read & Co., and transferred to De Leon by Rasin & Co. for a valuable consideration paid at the time by De Leon divested Read & Co. of the ownership in the goods and vested the right of property in De Leon, the same as if a regular bill of lading had been given by Read & Co. to Rasin & Co., and had been assigned by them to De Leon in good faith for value paid at the time of the assignment.

The second proposition is that whether the contract was an executed or simply an executory one, was immaterial, as the defendants are estopped from setting up any claim for a vendor's lien as against De Leon, by reason of the facts already stated herein.

I. As to the first ground of recovery. We are quite clear that the contract in question was executory, and in that respect we differ from the learned trial judge.

It is true that the contract uses the words "we have to-day *sold* to Messrs. R. W. L. Rasin," etc. But that language must be construed in connection with the rest of the contract, which must be taken as a whole, and such construction placed upon it as the language used in the entire instrument calls for. Looking at the contract in this light, it will be seen there are two facts which render it entirely clear that it is in its nature a purely executory one. One fact is, that there was to be an analysis of the super-phosphates by a New York or a Georgia chemist before delivery or payment, as provided for by the contract, could be insisted upon. Perhaps the vendee might, if he chose, waive the analysis and trust entirely to the guarantee and thus accept delivery without it. But the vendor could not compel an acceptance or claim payment without an analysis, and, therefore, no title passed upon the signing of the agreement. In this respect there is no material distinction between this case and *Russell* v. *Nicoll* (3 Wend. 112.) The language there used was "sold by Daniel Rapelye;" etc.

But because upon a perusal of the whole contract it was clear that the property sold was to arrive in New York before a certain date as a condition of the sale, the court said that such arrival must precede the change of title, and that the contract was executory ; that the word *sold* used in the contract meant contracted to sell. It is the same here. The word used means the same — " contracted to sell," because some material act had yet to be performed by the vendor before he could insist upon making delivery or claim payment for the goods, and that act was to make an analysis of each cargo or shipment which analysis must show the cargo to have reached a certain stipulated standard before his contract would be complied with.

The other fact is that there is in the contract no specification, identification or description of the particular property sold. It was simply 1,000 pounds of superphosphates. Where the goods were is in no way designated or intimated. They might have been in Europe, New York, Georgia, or (as was the truth), not *in esse*, and still every word of the contract have full significance. How is it possible to say that the title to any particular superphosphate passed to the vendee when there is no description or identification of it to be found in the contract, or any reference to it therein made ? Suppose the vendors had had 1,000 tons of the goods in their factory in New York, and that after the signing of the contract, a fire had totally destroyed the factory and its contents, who would have had to sustain the loss of such goods ? Is there the least ground for claiming that the vendees must suffer it ? Make the same supposition, but place the goods at Atlanta, and the same question arises and the same answer must be given. As is said by COMSTOCK, J., in *Kimberly* v. *Patchin* (19 N. Y. 330, at 333) : " It is not only legally but logically impossible to hold property in such things unless they are ascertained and distinguished from all other things, and this, I apprehend, is the foundation of the rule that, on a sale of chattels, in order to pass the title, the articles must, if not delivered, be *desig-*

*nated* so that possession can be taken by the purchaser without any further act on the part of the seller." This was said in a case where the question arose as to the transfer of title to a quantity of grain, a part of a larger quantity in a warehouse, which was designated and identified, and this court held the title passed on the execution of the contract. But when a quantity of oil was sold out of a stock consisting of different large quantities in different cisterns, and at various warehouses, and the note of sale did not express the quality or kind of oil sold, or the cistern or warehouse from which it was to be taken, and the purchaser did not even know where the particular oil lay which was to satisfy the contract, the court held the title did not pass ( *White, Assignee* v. *Wilks*, 5 Taunt. 176), and that case is cited with approval in *Kimberly* v. *Patchin* (*supra*).

The contract being executory when entered into, did not become an executed one by the acts of the parties in New York when the defendants took the notes of Rasin & Co. as provided for in the contract. The most that could be plausibly argued therefrom is that Rasin & Co. waived their right to demand an analysis before giving their notes for the goods: but nothing then done cures in any way the difficulty in the contract in its failure to designate or identify the goods which were sold, and in regard to which it was claimed title had passed to Rasin & Co. This fatal defect in the contract, which precludes all possibility of claiming it to be an executed contract under which title passed to any specific or designated 1,000 tons of super-phosphate, attends it at all times and renders further discussion of its character, useless. The question is not whether Rasin & Co. supposed the goods were in existence, but whether from that contract the title to 1,000 tons of designated and identified phosphates passed to them. It did not pass, notwithstanding all their suppositions, unless there were some designation or identification of some certain 1,000 tons, even though out of a larger mass, and that there was no such designation or identification,

the contract conclusively proves. It is clear, then, that the execution of this contract transferred no title to any particular goods to Rasin & Co., and that there was a mere agreement to sell and deliver in the future on the terms and conditions mentioned in the contract.

This so-called delivery order, signed by Rasin & Co. and addressed to the defendants, is not a bill of lading or a warehouse receipt, and has no properties in common with them. It requests defendants to deliver to De Leon 1,000 tons of ammoniated super-phosphate *sold to us,* and is signed by Rasin & Co. It identifies no goods, designates none, and does not state where they are deposited or with whom. It is simply a direction to the defendants, justifying them in delivering to De Leon 1,000 tons of the goods, and in calling such a delivery a delivery to Rasin & Co. It is no more than an assignment of the rights of Rasin & Co., under the contract to De Leon, who takes it and stands in the shoes of his assignors.

The acceptance of the order, which was signed by defendants, has no further effect (aside from the possible estoppel, of which I shall speak later), than to place defendants in a position where they might be compelled to deliver to De Leon, all other things being equal, unless Rasin & Co., in demanding a delivery to them, should produce the accepted order signed by the defendants. In other words, the effect of the transaction is to put De Leon in the place of Rasin & Co., with no other or greater rights in the matter than they had. The American authorities, cited by the learned counsel for the plaintiff as to the rights arising from the issuing or indorsement of bills of lading and warehouse receipts by custodians of the property, do not touch the case in hand.

It is said that the defendants, by the acceptance of the order, stood in the position of a warehouseman who has attorned, and their acceptance passed the property to De Leon. This assumes the whole question, and is, we think, wholly unwarranted. The nature of the transaction between Rasin & Co.

and the defendants is completely lost sight of. The truth, it must be remembered, is that defendants have agreed to sell to Rasin & Co. certain goods, unidentified and undesignated (and in truth not in existence), deliverable at a future day after an analysis should disclose the fact that the goods fulfilled the terms of the contract. All that this order does is to direct this delivery to be made to De Leon in fulfillment of defendants' contract with Rasin & Co. ; and this the defendants by accepting the order agree to do. De Leon, therefore, takes a paper which is in no sense a warehouse receipt or bill of lading, but which simply asks that the goods sold Rasin & Co. shall be delivered by defendants to De Leon ; and where those goods are, and the terms of the contract, it behooves De Leon to know. After acceptance the defendants were no more their own warehousemen than before. They entered into no other or different relations with De Leon than they had with Rasin & Co., and their only obligation to the former was to deliver to him, as they would have delivered to Rasin & Co., the 1,000 tons of the described goods upon the contract terms. A delivery order merely, transfers no title to the goods mentioned in it.

Considerable stress was laid on the argument upon the case of *Briggs* v. *Sizer* (30 N. Y. 647). In that case the order upon the drawee was not accepted, and for that reason the court held there was no cause of action against him. The opinion of the learned judge seems to assume that if there had been an acceptance of the order the plaintiff would have been entitled to recover. There was no question made of the right of the drawee (the defendant) to retain the goods until payment by the vendee (on his becoming insolvent), or by the assignee of the vendee, because the court held there was no liability on the ground of a lack of acceptance.

Therefore, whether in case the acceptance had been proved the judgment of the court would have been the same, if the right of the defendant to retain the goods until payment had been asserted because of the insolvency of the vendee, is matter of mere conjecture. That question has not been

decided and the case is no authority against the view which a majority of the court now takes of the questions involved in this case.

We think, therefore, that upon the first ground discussed the plaintiff fails to make out a case for judgment in his favor. He has shown no title to the goods by virtue of the Atlanta contract and the alleged delivery order accepted by the defendants.

II. The other ground for the recovery is that the defendants are estopped from denying the legal right of the plaintiff to a delivery of goods of the same character and quality as described in the Atlanta contract, because of all the facts, the Atlanta contract, the so-called delivery order, the letter and the acts of the defendants and the change of position of De Leon in reliance on them.

The question is raised by the exception to the charge of the learned trial judge in which he submitted to the jury the matters quoted above. After a careful examination of the alleged delivery order, its acceptance and the letter written by one of the defendants, and in the light of the testimony of both parties as to what occurred at the meeting between Rasin and Read in New York on the tenth of December, we think there was nothing which authorized the submission of any such question to the jury. The most that can be extracted from a perusal of all, including the oral evidence given on the trial, is that Rasin had contracted to deliver to De Leon goods which he did not have, and could not get in sufficient quantity; that he told this to Read and said that he had purchased the 1,000 tons from him in order to deliver them to De Leon on his contract. This Read knew, and he supposed when he accepted the order and signed the statement as to when he would deliver on the contract, that Rasin would give it to De Leon, unless he thereafter changed his mind, which there is no evidence to show he could not legally and properly at any time have done. It is not pretended that defendants had any design to mislead De Leon in the slightest degree. Such design may not, perhaps, be necessary, but it

does not exist here. There is not a word of evidence that Rasin said to defendants he intended to try and procure money or notes from De Leon on the faith of this order, nor was there any evidence but that this 1,000 tons, so far as defendants knew, were to be delivered in fulfillment of an obligation of Rasin to De Leon for the delivery of goods which had already been fully paid for. Indeed there was no evidence whatever of any further knowledge on the part of Read than that Rasin was under obligations to De Leon which he was endeavoring to partly fulfill by having defendants deliver to De Leon the 1,000 tons in fulfillment of defendants' contract with Rasin & Co. It is not pretended that Rasin said to Read he had been to see De Leon, and that he had finally consented to pay $25,000 for this 1,000 tons, provided he got an accepted order with this written statement from defendants, or that it would be upon the faith of this order and acceptance that he would advance the $25,000. This whole transaction, it must be remembered, is with Rasin. The order is drawn, signed and produced by him at the store, and the letter or statement signed by defendants is addressed to Rasin & Co., and is plainly a document showing a consent to deliver to De Leon in fulfillment of defendant's executory contract with Rasin & Co.

Nor is there anything in the form or contents of the order which prevents the defendants from withholding delivery. In the first place the order is not what is strictly and technically known as a delivery order. Such an instrument purports to order the delivery of goods then in existence and described, and in a known and designated place, so that possession could be at once taken thereof without further orders or permits from the owner. This is no such instrument. It describes no goods other than a mere statement of their kind, gives no designation as to where they are, or whether they are yet in existence. The word "sold" as has been already seen does not in and of itself necessarily imply either the existence of or the change of title in the goods. In other words, whether the contract changed the title to

existing goods, or only agreed to sell goods thereafter, is not to be decided solely by reference to the word *sold* as found in the contract.   Whether there has been this change of title depends upon the whole of the language used in the contract, and the circumstances of the transaction, and unless a party has done some act which estops him he may always show what those facts are in order to see whether the title has or has not changed.   There is no act of defendants proved here which should estop them from showing the truth that no title had passed, and that the words "sold to us" as used in the accepted order meant the same as when used in the contract, viz., " contracted to be sold."

De Leon, therefore, took such an order at his peril, and received from defendants no representation, whatever, tending in any way to show that any title to any specific property had ever passed to Rasin & Co.   He occupies, therefore, simply the position of Rasin & Co. in regard to the property. The right remains with the vendors to refuse delivery to the vendees on their becoming insolvent, unless they pay for the property on delivery.   A tender of notes of the insolvent as payment of the property is no payment within the meaning of this rule, even though agreed to be so received in the contract.   By the insolvency which happens subsequent to the making of the contract, the right to refuse delivery springs up unless payment in cash is made.

All that is seen by the accepted order, therefore, is that the defendants acknowledged that they have sold (which expression may mean simply contracted to sell), certain goods mentioned therein to Rasin & Co., which they agree, with Rasin & Co., to deliver to De Leon.   If the latter desired accurate information from the vendors in order to bind them as to the meaning in this instance of language which is susceptible of different meanings, he should have asked them, and if the defendants then made any false representations, or were guilty of acts which were equivalent thereto, they might thereafter be estopped from showing the truth as against one who, on the faith of such representations or acts, had altered his posi-

tion to his detriment if the truth should be proved. Here is no such case. When the order is produced by Rasin and accepted by defendants, the implication which accompanies it on these facts, is that defendants will deliver to De Leon under the same circumstances which they would deliver to Rasin & Co., and if circumstances should arise prior to the delivery which would absolve the defendants from their obligation to deliver to Rasin & Co., by reason of their insolvency, the same right would remain with defendants when a delivery should be demanded by De Leon.

The written statement is but an amplification of the order and its acceptance, and creates no other or greater rights in De Leon than he would have had under the order alone. It makes the time of delivery a little later than the original Atlanta contract, but no new obligation is thereby entered into by defendants.

To give the jury, upon the evidence in this case, the right to say what the intentions of the defendants were as to a waiver of their right to refuse delivery on the insolvency of their vendee until payment should be made, is to submit a question of law to that body, and is, therefore, error.

What we say is that there is no evidence in the case authorizing the submission of this question of intent on the part of the defendants. Taking it altogether, the evidence shows that it is simply a promise on the part of defendants, made to Rasin & Co., to deliver goods (unidentified and undesignated) to De Leon, which they had contracted to sell to Rasin & Co., and such delivery was to be in fulfillment of such contract, with the same right to refuse delivery to De Leon which they would have had to refuse it on demand of Rasin & Co.

This case is quite as strong for the defendant as that of *Farmeloe* v. *Bain* (1 C. P. Div. 445). In that case defendants sold 100 tons of zinc to B. & Co., and gave them an order, in which defendants undertook to deliver to their order, indorsed thereon, twenty-five tons, etc., "*off your contract of this date*," and signed it. Upon the faith of this docu-

ment the plaintiffs bought of B. & Co. and paid for fifty tons of zinc, and B. & Co. having failed without having paid the defendants, they refused to deliver the zinc to the plaintiffs. The jury found that the defendants, in signing the order, intended the same as a representation to all persons to whom it should be shown that the goods therein mentioned were the property of B. & Co. The court, however, held that this document, thus signed by defendants, was not a known document among merchants and was to be looked at as any other instrument in writing, and as thus looked at it contained no representation of any fact, and the plaintiffs had no right to rely upon it as such a representation, and consequently could not claim an estoppel.

In the documents before the court in this case, there are no representations of any fact which the defendants now seek to deny. They simply claim the right to refuse to deliver to an insolvent vendee, or his assignee, goods which they had contracted to sell and deliver to one whom they supposed solvent when the contract was made. They deny no fact stated in their writings, and they take no new or different position and claim no other or further right than they have at all times had.

The case of *Knights* v. *Wiffen* (L. R. 5 Q. B. 660) is in no respect adverse to these views. It was decided in 1870, and the case of *Farmeloe* v. *Bain* (*supra*) in 1876. If the latter case were antagonistic in any way to the earlier it would at least have been mentioned. This later one is much more like the case at bar than is that of *Knights* v. *Wiffen.* There is, however, a clear distinction between *Knights* v. *Wiffen* and the case under discussion. In that case the defendant had a quantity of barley in sacks lying in his granary, which adjoined a railway station, and he sold eighty quarters of it to M. No particular sacks were appropriated to M., though the barley remained at the granary subject to the orders of M., but in the possession of defendant, who was an unpaid vendor. M. afterwards sold sixty sacks to the plaintiff Knights, who paid him therefor. M. gave plaintiff

a delivery order on the station master, as agent of defendant, to deliver to plaintiff the sixty sacks, and the defendant accepted it and said "all right," etc. It was held that defendant was estopped from denying that upon the receipt of the order he had appropriated out of the greater bulk the sixty sacks in question, and that so the title had passed to the plaintiff, who was entitled to its possession; that the other party had altered or changed his position by virtue of defendant's acceptance of this delivery order, and the acceptance substantially acknowledged that defendant had made such appropriation, and consequently he must be treated as if he had, in which case the title and right to the possession of the barley would have passed to the plaintiff. These facts stand out in that case. The property was *in esse*, known and described, being a part of a larger quantity in the actual possession of the defendant. The delivery order for a part of the barley is shown him and he accepts it. He thereby, in effect, acknowledges that he has the barley in his possession; that an appropriation has been made of the proper amount and placed in the possession or under the control of the purchaser, and that acknowledgment is the statement of an existing fact which the plaintiff relied on and acted accordingly. No such case exists here. This is an executory contract between defendants and Rasin & Co., by which defendants are to deliver, at a future time, property of a certain kind, neither designated, identified or appropriated, and as matter of fact not then in existence. The vendees ask defendants to deliver to De Leon the property sold to them, and the defendants accept the order and state in writing when they will be able to deliver. Here is no transfer of the title to any property to De Leon, nor is there any representation by act or speech of the existence of any fact from which such inference might be drawn by a reasonable man.

The other English and American cases, cited by plaintiffs' counsel upon the question of estoppel, were decided upon the same principle as *Knights* v. *Wiffen (supra)*. In that case, as well as in the other cases, it must be always borne in mind

that the title and the right to the possession of certain specific property (which was *in esse*, described and its whereabouts known and stated) would have passed to the claimant if the things had actually been done by the warehousemen, wharfingers, etc., which by their acts the court held they acknowledged that they had done, and upon the faith of which acknowledgment and representations the claimants had acted. Under such circumstances the courts decided that these same warehousemen, wharfingers, etc., could not turn around and, after the claimant had altered his position on the faith of their acts and representations showing that title had actually passed to him, undertake to deny the same and claim the property.

The claim of plaintiffs' counsel that many of the American cases hold the doctrine that delivery orders transfer the title to the property the same as a bill of lading, even without acceptance, is not material here. No delivery order, nor any other document, can transfer the title to property not in existence or unidentified and undistinguishable from a larger mass, not itself designated and from which no appropriation has been made.

We are thus, in this case, brought back to the one material question of estoppel, and upon that we think the counsel for the plaintiff necessarily fails. He does not claim to be able to maintain his recovery on the principles applied in *Lawrence* v. *Fox* (20 N. Y. 268), and other like cases. In this we think he is correct.

After carefully examining the facts in this case in all their bearings, as presented by this record, we think no title passed to any goods by virtue of the papers mentioned herein, and that there was no estoppel, and that the only effect of the transaction proved was to substitute De Leon for Rasin & Co., subject to defendants' right to refuse delivery to either on the insolvency of the vendees, Rasin & Co.

The judgment should, therefore, be reversed and a new trial ordered, costs to abide event.

DANFORTH, J., (dissenting). The plaintiff sues as assignee of one P. M. De Leon, for the benefit of creditors, and seeks

to recover from the defendants damages for the non-delivery by them of 1,000 tons of super-phosphates mentioned in the following instruments, viz., an order in these words:

"BALTIMORE, *December* 7, 1881.

"Messrs. READ & Co., 34 *Beaver street*, *N. Y.*

"GENTLEMEN.— Please deliver to P. M. De Leon one thousand tons of ammoniated super-phosphates sold to us, and oblige,                          "Very respectfully,

"R. W. L. RASIN & CO.,"

which was drawn by Rasin & Co., and accepted by the defendants under the name of Read & Co., by writing across the face of the paper "accepted," and signing the same by their firm name, and so accepted was delivered to Rasin & Co. with the following memorandum:

"To Messrs. R. W. L. RASIN & Co., *Baltimore, Md.*

"From READ & Co.,
           "34 *Beaver street, New York, December* 10, 1881.

"DEAR SIRS.—We will deliver to Mr. Perry M. De Leon on your order dated Dec. 7th, accepted by us to-day, one cargo, say 500 tons to vessel, to begin loading about the 19th December, and the remainder of the 1,000 tons to a vessel to load the latter part of December or early in January, 1882, vessels to be furnished by Mr. De Leon.                  "READ & Co."

On the same day (December tenth), Rasin & Co. delivered both papers to De Leon, who, as the jury have found, received them, and upon the faith and credit induced thereby, paid to Rasin & Co., the sum of $24,450. The defendants subsequently, and before the time fixed for delivery, gave to De Leon notice in writing that they would not execute the accepted order or fulfill the contract. The defendants set up by answer, and also upon the trial, that they received no consideration for the acceptance and agreement, and were induced to execute the same by certain false representations made to them by Rasin & Co., and, in substance, that De Leon as

privy thereto, colluded and conspired with Rasin & Co. to make a colorable and apparently *bona fide* transfer of the writings for the purpose of cheating the defendants. The jury found against these allegations.

It appeared that, in fact, Rasin & Co. were insolvent and had not paid Read & Co. for the goods. The defendants upon the trial claimed a right to retain them, and concerning that the learned trial judge charged the jury: "If you believe that Mr. Read thought, when that paper was signed by him for the purpose of being delivered to Mr. De Leon, that it would lead Mr. De Leon to the opinion that he was to have the ownership of these goods on the day mentioned in that paper, in the letter for the delivery of them, and that that possession was not to be interfered with by any claim on the part of Messrs. Read for their vendor's lien, why, then, gentlemen, you will say so by your verdict. If you believe that that paper was meant to convey the effect on Mr. De Leon's mind that he was to have the possession of the articles in question free from the vendor's lien, and that Messrs. Read, in signing that paper, intended to convey that fact upon De Leon's mind, you will find a verdict for the plaintiff. If, on the other hand, you believe that Messrs. Read, in signing that paper, intended to reserve their vendor's lien, and had no intention whatever to convey any other idea to Mr. De Leon, then, gentlemen, you will find for the defense."

The verdict in plaintiff's favor, therefore, established that the intention of Read & Co. was to give assurance to De Leon that he was to have the goods free from any claim on their part. The General Term sustained the recovery, and we are brought to the inquiry whether any error of law was committed by the trial judge which requires a new trial. But as the appeal has been put in a great degree upon the relations between Read & Co. and De Leon and Rasin & Co. in respect to the property in question, a statement concerning the facts on which those relations depend, will be necessary. All the parties were dealers in fertilizers, and Read & Co. and Rasin & Co. were also manufacturers. On the 17th of September,

1881, an agreement was made between De Leon and Rasin & Co., by which in December, 1881, and January, 1882, Rasin & Co. were to supply De Leon with 2,000 tons of fertilizers at twenty-four dollars per ton, and he was to pay therefor by notes maturing from November 1 to December 15, 1882, without interest. De Leon undertook to supply the article to other parties, and Rasin & Co., having delivered only 300 tons, were repeatedly urged by De Leon to complete delivery so as to enable him to fill his orders. Read & Co. had had dealings with Rasin & Co., and about this time solicited further orders, and an agreement in writing was made between Read & Co. and Rasin & Co., of which the following is a copy:

"ATLANTA, Ga., *December* 7, 1881.

"We have to-day sold to Messrs. R. W. L. Rasin & Co., of Baltimore, Md., one thousand tons ammoniated super-phosphates at twenty-four ($24) dollars per ton (2,000 lbs.), on a cash basis, goods to be delivered free on board buyer's vessels, and by us in bulk. We guarantee the analysis of goods to be not less than 2 per cent of ammonia, and not less than 8 per cent of available phosphoric acid, sampling and analysis of each shipment to be made by A. R. D. Dane & Co., of New York, or by Prof. White of Georgia. Settlements are to be made on delivery to buyers of bills of lading, by their notes, with 6 per cent interest added. For the convenience of sellers, buyers agree to make their notes at four months, with the understanding that they are to be renewed, so as to mature finally not later than December 10th and December 20th, 1882, say one-half each date. Shipment to be made as early as possible during this month.

"READ & CO., *of New York.*

"We accept the above.

"R. W. L. RASIN & CO., *Baltimore, Md.*

"Messrs. Read & Co. have the option of furnishing an additional one thousand tons on above terms within twenty days from this date."

The evidence tended to show that this agreement was made by Rasin & Co., because of the non-completion of their new factory and consequent inability to keep their agreement with De Leon, who was "pressing them for a delivery," and that Read & Co., before their acceptance of the order making the memorandum above set out, were notified of this difficulty and of the desire of Rasin & Co., to give De Leon their goods in order to fulfill the contract. On the same day (December 10, 1881), Read & Co. billed the goods to Rasin & Co. at twenty-four dollars per ton, with interest to December 15, 1882, amounting to $25,428, and credited Rasin & Co. with their notes then given, ten in number, each for $2,542.80, maturing at different times and in all amounting to the same sum of $25,428.

In my opinion the record shows two mutual and independent contracts, for the breach of either of which an action would lie. There was one contract between Rasin & Co. and Read & Co., and another contract between Read & Co. and De Leon. The first is of no importance to the parties in this action if the second is valid, and if by it De Leon was induced to advance money to Rasin & Co., upon the belief that Read & Co. intended to become bound according to its terms. The right thus created could not be put an end to by annulling the contract between Rasin & Co. and Read & Co. The reasoning of the court in *Briggs* v. *Sizer* (30 N. Y. 647), is to the effect that it is not necessary there should be a consideration moving from the payee to the drawee of such an order as the one now before us, to support an acceptance; that as in the case of a bill of exchange the consideration for the acceptance moves between the drawer and drawee, and not between the holder and acceptor, and the whole argument of the learned judge writing in that case, goes to show that after acceptance of an order for merchandise, a privity is established between the payee and acceptor, which makes the latter liable at the suit of the payee. In that case, however, there was no actual acceptance, but only facts from which it was sought in vain to infer an acceptance, and the court say, there being no

acceptance, the action must fail. The order or draft in that case was for merchandise; it was similar in form to that at bar, and it is plain the conclusion of the court as to the effect of an acceptance, had one been made, would be decisive in favor of the plaintiff here. But as there was in fact no acceptance, it is argued by the appellants that the reasoning is uncalled for by the circumstances, and the opinion *obiter*, and so not decisive in any other case. The observations of the court were not mere *dicta*, but the main part of an argument expressive of a deliberate and carefully considered opinion. It is, therefore, entitled to weight, and the principle upon which it stands, is applicable to the case at bar.

As most favorable to the appellants, let us assume that there was no consideration between Read & Co. and Rasin & Co., *i. e.*, between drawer and drawee, and that Read & Co. accepted without consideration, simply for the accommodation of Rasin & Co., or even that the acceptance was procured by representations of Rasin & Co., which were in fact false, but not known to be so by either Read & Co. or De Leon. In such a case, until actually delivered to De Leon, the acceptance might have been withdrawn or revoked, and so it might have been even after delivery to De Leon and until, without notice, he had made advances on the strength of it, or in some other way changed his position; for until that event, he was not a party to the contract. But the moment he, relying on this acceptance, paid Rasin & Co. for the goods, he became a holder for value of the acceptance and a party to the contract. For such payment indicated his assent to the obligation, and the promise of Read & Co., which was before a mere naked promise, became clothed with a consideration and a new debt was contracted in his favor.

· A point is made by the appellant that "by the delivery of the order and memorandum the property in the goods did not pass to De Leon." These papers, the learned counsel argues, "are not *indicia* or documents of title, nor *quasi* negotiable." If I am right in the view already expressed as to the effect of the acceptance by Read & Co. and the pay-

ment of money by De Leon, the question raised by the appellants' proposition as to the effect of a mere delivery order is quite irrelevant and constitutes no legal excuse for the non-delivery of the goods.    It may be conceded that if De Leon were to be regarded merely as an assignee, although for value, of a bill of lading or a delivery order, or a warehouse receipt, his right to recover would depend upon the title or right of his assignor, and thus be subject to any defense which might exist against Rasin & Co.    The appellants cite authorities to that effect; among them and as applicable as any others are *Collins* v. *Ralli* (20 Hun, 246, and 85 N. Y. 637); *Hentz* v. *Miller* (94 N. Y. 64); *Farmeloe* v. *Bain* (L. R., 1 C. P. Div. 445); *Imperial Bank* v. *London & St. Katharine Docks Company* (L. R., 5 Ch. Div. 195, 200).    But to what effect are the authorities?    In *Collins* v. *Ralli* there was a very able and instructive opinion, which, upon appeal, was adopted by this court (85 N. Y. 637) and afterwards cited with approval (94 N. Y. 64).    Omitting matters not now material, it went upon these circumstances:    One Cutter, by fraud, induced the plaintiff to sell certain bales of cotton to mills which he assumed to represent, and deliver to him a bill of sale running to the mills.    In like manner he procured a delivery order upon the warehousemen who had the cotton in store, and there he marked the cotton with the address of the mills.    He next stored the cotton in another warehouse, taking receipts in his own name and afterwards in the name of his brokers.    The marks were then removed from the bales, and the defendants bought the cotton in good faith for value and shipped it to Liverpool.    The plaintiffs sued them for the value of the cotton, and recovered upon the ground that Cutter was guilty of larceny in fraudulently obtaining the custody of the cotton and converting it to his own use; and as the plaintiff had never conferred upon him the apparent title thereto, or any authority to dispose thereof, the plaintiff was not estopped from reclaiming it from the defendants.

The case turned upon the propositions that the fraud of Cutter was equivalent to larceny, and the absence of an *indicia*

of title conferred on him by the plaintiff. The learned court, applying the doctrine of *McNeil* v. *Tenth National Bank* (46 N. Y. 325, 329), added: "If plaintiff clothed Cutter & Co. with apparent title or power to sell, or did anything out of the usual course of business calculated to, and which actually did, mislead the defendants in respect to the ownership or right of sale of the cotton, it would clearly be inequitable to permit the plaintiff to recover therefor from the defendants, who had parted with their money on the faith and credit of the appearances so created by him, the principle of estoppel would apply." And, referring to the defendants' claim that this was affected by the delivery orders, say: "These orders were the means adopted to put Cutter in temporary possession of the cotton so that it might be shipped to his assumed principals," adding, they "worked no harm to any one. They were not seen by defendants, or any person representing them, and their existence even was unknown to them," so that, even if the delivery order indicated title, it would furnish no support to their claim of estoppel. But it was also held that such an order related only to the possession, and that its purpose was served when it was delivered to the warehouseman, and he obeyed it; and the elementary rule that bare possession is not sufficient to enable one to convey title was applied. But the distinction between such a case and that of a person procuring the sale of goods by reason of false pretenses was adhered to. The learned court referred to the fact that in the case then in hand there was no sale, no purchase, and so the title remained in the plaintiff, and no doubt was entertained that if by fraudulent contrivance a person induced the sale and delivery of goods to himself, he could convey a good title to a *bona fide* purchaser for value, so long as the original owner had not exercised his right to revoke the sale and reclaim his goods. *Hentz* v. *Miller* (*supra*) goes no farther and holds that, so far as the real owner has allowed another to have the appearance of ownership, he is estopped from setting up his own right. The other cases cited only show that a delivery order, or other similar instrument, gives the

assignee no greater right of action than the assignor had, although by its terms it runs to the promisee or his assignee. They show that such a document is not a negotiable security, and clearly it is not. In *Farmeloe* v. *Bain (supra)*, for instance, the plaintiff took as indorsee an instrument made by the defendant to Burrs & Co., in these words : "We hereby undertake to deliver to your order indorsed hereon, twenty-five tons merchantable sheet zinc, off your contract of this date." On the strength of this paper, indorsed by Burrs & Co. to the plaintiff, they accepted bills drawn by Burrs & Co. It was held that the giving of this undertaking did not estop the defendants from setting up against the plaintiff their right, as unpaid vendors, to withhold delivery, and that Burrs & Co. were not at liberty to transfer to their vendees a property in the zinc which they themselves did not possess. The plaintiff contended that the undertaking was a representation that the zinc belonged to Burrs & Co. free from any lien, and sought to apply the doctrine of equitable estoppel, but failed, because it stated no fact, and left the indorsee or assignee to recover, if at all, on the case of his assignor. So in *Imperial Bank* v. *London and St. Katharine Docks Company (supra)*, the plaintiff claimed by indorsement under a delivery order, and the defendant justified in substance under the title of a vendor's lien for unpaid purchase-money of the goods in question, and succeeded, the court holding that so long as the vendor was in possession "as vendor and in no other character," and was unpaid, he could maintain his lien as vendor, notwithstanding he had given a delivery order. Therefore, it may well be as the appellant contends, settled law, that the indorsement and transfer of a dock warrant or warehouse certificate, or other like document of title, by a vendor to a vendee, will not divest the vendor's lien. The present case is not governed by such doctrine. We have here a very different thing. A contract or promise from the vendor directly with and to the plaintiff, not resting on representation or assignment, but upon novation — a new debt or undertak-

ing in place of the old. Nothing is transferred from the assignor to the assignee; the debt due the original vendor is extinguished and a new one created by the acceptance. Read & Co., from the moment of acceptance, became bound as bailees to De Leon, at first contingently upon the payment by him on the faith of the acceptance, and upon that payment absolutely. They no longer held the character of vendor only, but were acceptors, and by assuming that character an end was as effectually put to the vendor's lien as if there had been an actual delivery of the goods to the vendee, or they being in a common store, the warehouseman had on the seller's order transferred them on his book to the purchaser. In either case there is, in legal effect, an actual change of custody. In the case of a mere assignment of a warehouse receipt, or an assignment of a delivery order, it has been held that neither amounts to a constructive delivery of the goods covered by it, but where the warehouseman is notified of the assignment, and agrees to hold the goods for the assignee, such effect is to be given to it. (*Wilkes* v. *Ferris*, 5 Johns. Rep. 335; *Briggs* v. *Sizer, supra;* Addison on Contracts, 959.) This author sums up the doctrine by saying: "If the goods have been resold, and the second purchaser has received from his immediate vendor, the first purchaser, a delivery order addressed to the original vendor, which has been accepted by him, the original vendor cannot, after he has thus attorned to such second purchaser, refuse to deliver the goods to such second purchaser, pursuant to his acceptance, although the first purchaser to whom he sold became bankrupt before delivery, and before payment of the price, and the goods were not weighed or measured over prior to the bankruptcy of the first purchaser."

In the case before us the transaction implies a title in De Leon, and the receipt not only acknowledges that, but contains an express promise to deliver the property to him. The transmutation of title is, therefore, as complete as if produced by the attornment of a warehouseman or dock-master to the holder of a dock warrant or delivery order.

More in point to the case actually before us, and in contrast with those cited by the appellants, is *Armour* v. *Michigan Central Railroad Co.* (65 N. Y. 111). The action was upon two bills of lading or carrier's receipts, issued in the name of the defendant by its agent. The defense was (1) that they were issued by him without authority, he being authorized to bind the company only for goods actually shipped, and there were none; (2) that he was induced to issue them by fraud practiced by one Michaels. The facts were that Michaels presented to the defendants' agent a receipt purporting to be signed by one S., a warehouseman, for 200 packages of lard in store for account of Michaels, " and subject to the return of the receipt properly indorsed." This was delivered to the defendant's agent, accompanied by the order of Michaels for 100 packages, and afterwards a similar order for 100 other packages, and in each instance the defendant, by its agent, executed and delivered to Michaels a carrier's receipt acknowledging the receipt from him of one hundred packages of lard consigned to the plaintiffs at New York, and to be there delivered to them. The defendant, at the time the receipts were given, was informed by Michaels that he intended using the same at bank the same day. He did so by drawing on the plaintiffs for $3,600 in each case. and attaching to the respective drafts one of the bills of lading. The bank discounted the drafts and forwarded the same to New York for collection. They were paid by the plaintiffs on the faith of the defendant's receipts, and the lard not being delivered they sued the defendant. They recovered before the referee for three packages, but were defeated as to one hundred and ninety-seven of them for reasons which are not involved here. At General Term the decision of the referee was affirmed, but upon appeal the judgment was reversed upon grounds showing that in the opinion of the Commission of Appeals they were entitled to a full recovery upon both receipts. One commissioner stated that the principle that a party, who, by his admissions, has induced a third party to act in a particular manner, is not permitted to deny the truth of his admission if the conse-

quence would be to work an injury to such third person, applied to and governed the case ; in substance, saying that the defendant having been the cause of the advances made by the plaintiffs, must be held to have intended what was in fact the legitimate consequences of its own misstatements. The commissioners call attention to the fact that the bills or carrier's receipts run directly to the plaintiffs, that they were not assignees of bills made to Michaels, but that the contract to deliver the lard was made directly with them, and distinguish the case from one where title is made by assignment and the assignee takes only the right and place of the assignor, adding "the fact that a bill of lading is not negotiable has nothing to do with the question." That point would have been open for discussion if the bills had been issued to Michaels and then assigned to the plaintiffs. As it was, the representation having been made direct to the plaintiffs, their right of action is not derived through Michaels, but rests upon the direct relations between itself and the plaintiffs.

These positions in every aspect support the respondent here and are warranted, it is believed, by a line of well-settled decisions, and, among others, by *McNeil* v. *Tenth National Bank (supra)* ; *Moore* v. *Metropolitan National Bank* (55 N. Y. 41), and *Voorhis* v. *Olmstead* (66 id. 113). Another strong case in the plaintiff's favor, and much in point, is *Knights* v. *Wiffen* (L. R., 5 Q. B. 660). There M. bought barley from B., and, without paying for or receiving the same, sold it to D., gave an order on B. for its delivery and received payment. D.'s agent showed the order to M., who said it was all right and when a note for forwarding was received he would ship the barley. M. became bankrupt, and the defendant, setting up a vendor's lien, refused to deliver the barley. D. sued B. for the barley. The court held him estopped, because if he had refused assent to the order, peradventure D. might have received the money paid M., at least he had altered his position by abstaining from the attempt. This case is cited and followed under somewhat similar circumstances by this court in *Voorhis* v. *Olmstead* *(supra)*. The present is much

stronger for the plaintiff because here the plaintiff actually paid his money on the strength of the acceptance, and not in expectation of it, and in this respect also the defendants knew the plaintiff would act upon it. In *Knights* v. *Wiffen* (*supra*), the defendant was his own warehouseman, as was the defendant in the case before us.

The appellants argue that the contract between Read & Co. and Rasin & Co. was executory. I find nothing in the writing to warrant that contention. It purports to be, not an agreement to sell, but an actual sale; not an agreement to manufacture and deliver, but a sale as of existing property, to be delivered at a time fixed, and payment was in fact made by Rasin & Co. by notes executed and delivered to Read & Co., and accepted by them in settlement before the acceptance of the order in favor of Read & Co. was given. Nothing more remained to be done by Rasin & Co., nothing by Read & Co. save to make delivery. But however that may be, and whatever construction should be given to that contract, there is no ambiguity or doubt as to that between Read & Co. and De Leon. There is nothing in it to suggest to De Leon the existence of any incident or circumstance which makes the obligation of Read & Co. less than absolute, or the interest of Rasin & Co. in the goods other than that of a purchaser having a perfect and complete title. The order calls for goods "sold" to the drawer. The acceptance is an agreement to deliver those goods. There is no reference to a contract to sell, or to any executory, or incomplete or unexecuted contract, but to a perfected result. The order and acceptance is a representation in effect that Rasin & Co. are the owners of the goods then held by Read & Co. But it is said upon evidence outside the writing that the goods were in fact to be manufactured, that Read & Co. had indeed the ingredients but had not compounded them. The cases of *Griswold* v. *Haven* (25 N. Y. 595), *Knights* v. *Wiffen* and *Armour* v. *Railroad Company* (*supra*), show that this is no answer. The reply may be given in the language of BLACKBURN, J., in the former case, " that when one

states a thing to another with a view to the other altering his position, or knowing that as a reasonable man he will alter his position, then the person to whom the statement is made is entitled to hold the other bound, and the matter is regulated by the state of facts imported by the statement." So are the other cases and such is the general doctrine (2 Smith's Law Cases, [7th Am. ed.], 668.) The verdict of the jury establishes not only that such was the effect of the defendant's statement to De Leon, but that such effect was looked for and intended by them when making it. (*Farmeloe* v. *Bain* (*supra*), much relied on by the appellants and already referred to is in no degree in opposition to the plaintiff's case, but stands on a different theory. There the plaintiff claimed as assignee, stood in the place of the original vendee, and took by virtue only of his contract and with notice, and by the language of the agreement he might be deemed put upon inquiry as to the nature and terms of the contract, in fulfillment of which the defendant made his promise.

Upon the subject of damages, the learned trial judge charged that if the plaintiff recovered he would be entitled to the value of the property at the time fixed for delivery, with interest from that time. A general exception was taken by defendants, but no suggestion made as to any other measure of damages. We find no error. As owner of the goods, De Leon was entitled to them or to their value. In no other way could he be made good, and the plaintiff, as assignee, stands in his place. The other questions raised have been considered, but disclose no errors affecting the case.

The judgment should be affirmed.

RAPALLO, EARL and FINCH, JJ., concur with PECKHAM, J.; RUGER, Ch. J., and ANDREWS, J., concur with DANFORTH, J.

Judgment reversed.