*In re* IVES *et al.*

*In re* COOMBS *et al.*

*(Supreme Court, Special Term, New York County. May, 1890.)*

1. ASSIGNMENT FOR BENEFIT OF CREDITORS—PROOF OF CLAIMS—UNLIQUIDATED DAMAGES.

An assignment for the benefit of creditors to pay "all debts and liabilities" of the assignor includes damages for the breach of a contract of sale made before the assignment, though the breach occurred afterwards.

2. SAME—ACCOUNTING BY ASSIGNEE.

Where the claimant fails to liquidate his claim, either by holding for the assignor the property sold and requiring him to pay the contract price, or by reselling and recovering the difference between the amount thus realized and the contract price, or by retaining the property and recovering the difference between the contract price and the market price at the time of delivery specified in the contract, but contends that the market value of the property, if anything, was incapable of ascertainment, he will not be allowed to prove his claim on the final accounting of the assignee.

Special proceedings instituted by William N. Cromwell to account as assignee of Henry S. Ives & Co. John C. Coombs and others present a claim against the assigned estate.

Before FRANCIS LYNDE STETSON, Esq., Referee.

*W. J. Curtis,* for the assignee. *John C. Coombs* and *William Faxon, Jr.,* for claimants. *Lawrence & Waehner,* for other creditors.

STETSON, R.    The circumstances and conditions of this claim as presented
by Mr. Coombs, representing a minority group of the preferred stockholders
of the Dayton & Ironton Railroad Company of Ohio, are sufficiently involved
to suggest at the outset doubt as to whether the claim is one properly within
the cognizance of a referee appointed upon a proceeding under the insolvency
statute of 1877, to pass upon the accounts of an assignee for the benefit of
creditors.    The assignee and two of the creditors, The Cincinnati, Hamilton
& Dayton Railroad Company and the Mineral Range Railroad Company, in-
sist that the claim is one not provable before this referee, who has neverthe-
less received all the evidence that the claimant desired to offer upon the sub-
ject, which may be generally and summarily stated as follows:    Late in the
year 1886, Henry S. Ives and associates, then being in control of the Dayton
& Chicago Railroad, acquired about 16,000 of the shares of the capital stock of
the Dayton & Ironton Railroad Company, which had a total issue of about
25,000 shares.    Ives and associates then proposed to consolidate the two
roads, but were opposed by John C. Coombs, William Faxon, Jr., and others,
owning or controlling at least 5,062.8 shares.    This opposition much embar-
rassed the proposed consolidation, which could be effected only upon condi-
tion of providing payment for these dissenting shares at the market value,
which was then about $40 per share.    But notwithstanding such opposition,
and the formal written refusal of such minority stockholders, through Will-
iam Faxon, Jr., at Dayton, Ohio, May 24, 1887, the consolidation was then
and there carried through, and a new corporation organized called the Dayton,
Fort Wayne & Chicago Railroad Company.    This result, however, was thus
accomplished largely in consequence of the transaction carried through in New
York on the preceding day (May 23, 1887) by and between Henry S. Ives and
John C. Coombs, who was here representing the same stockholders for whom
Mr. Faxon acted the next day at Dayton.    It was proposed by Ives, who, with
his partners, employes, and associates, then controlled the Dayton & Ironton
Company, and were to control the consolidated company, that the Dayton &
Ironton Company should acquire all of this minority stock, paying therefor
the then market price of $40 per share, and should then retire or cancel such
stock.    Mr. Coombs hesitated to accept this proposition, expressing doubt as
to the power of the Dayton & Ironton Company so to bind itself, in view of
the impending consolidation, which would substantially extinguish all power
of these minority stockholders.    Ives thereupon agreed that his firm should
contract to buy the stock, and that the Dayton & Ironton Company should
guaranty the contract.    Accordingly, upon May 23, 1887, John C. Coombs
and associates, as vendors, and Henry S. Ives & Co., as purchasers, entered
into an agreement whereby the vendors agreed to sell and the purchasers
agreed to take within three months, at the price of $40 per share, all the
shares of the preferred stock of the Dayton & Ironton Company which should
within that time be offered by Coombs.    This agreement expressly reserved
to the vendors the right, under the statutes of Ohio, to refuse to accept the
terms of the proposed consolidation, which right, as observed before, was ex-
ercised the next day at Dayton by William Faxon, Jr.; but no further steps
in opposition seem to have been taken.    The performance of this agreement
of Ives & Co. was simultaneously guarantied by the Dayton & Ironton Com-
pany, under Ives' direction.    On June 20th Mr. Coombs wrote to Ives & Co.,
advising them that he then held on deposit, in Boston, 5,062.8 shares, subject
to the agreement of May 23, 1887.

The principal contract, therefore, is to be considered as being, on June 20,
1887, the positive agreement of Ives & Co. to purchase and take from Coombs
on or before August 23, 1887, 5,062.8 shares of the preferred stock of the
Dayton & Ironton Railroad, such particular shares, or rather the certificates
therefor, then being identified and ready for delivery upon the precedent con-
dition of payment of $40 per share therefor; such agreement also expressly

reserving to the sellers (until such payment) certain rights of stockholders under the Ohio statutes. Before the expiration of the period in which the purchasers were to take this stock, they became insolvent, and, on August 11, 1887, made to William Nelson Cromwell an assignment for the benefit of creditors as therein stated. Twelve days later the contract matured, and Mr. Coombs tendered the stock to the assignee, and demanded payment of the agreed price, amounting to $202,512. The tender was declined, and payment refused. Thereafter Faxon and Coombs applied to the courts of Ohio, under the statutes of that state, to assess the value of the stock as against the constituent companies at the price of $90 per share, two and one-half times the price to Ives & Co. These proceedings were not pressed to conclusion, but were indefinitely continued in view of the agreement hereafter mentioned of October 27, 1887. They also proceeded in the courts of Massachusetts against the firm of Ives & Co., to enforce their claim, but without material effect up to this time. They also took another step in Ohio which seems entitled to special consideration in the estimate of the legal value of their claim as against the insolvent estate of Ives & Co. They entered into a contract, dated October 27, 1887, with the consolidated company, which, acknowledging and ratifying as its own the previous guaranty of the Dayton & Ironton Company, expressly agreed to pay to Faxon and associates the agreed purchase price of such 5,062.8 shares, and $5,000 additional; and Faxon thereby specifically promised, upon such payment, to deliver such stock to the consolidated company. A few months later the consolidated company went into the hands of a receiver, and this agreement, like all its predecessors, came to naught.

It appears that, since August 23, 1887, there has been substantially no market for this stock of the Dayton & Ironton Company, which has ceased to exist as a separate company, such stock being now held in two or three large blocks, and that the only proved sale is one of about 20 shares for 50 cents a share; and now Faxon, Coombs, and associates make their claim against the assigned estate for $202,512, and interest from August 23, 1887, stating this to be the precise amount of damages resulting to them by reason of the breach of Ives & Co.'s promise to pay on that day the purchase price of 5,062.8 shares of this stock at $40 per share. To this the objecting creditors answer that, notwithstanding the variety and volume of the claims and statements of Mr. Coombs, his claim is simply and merely one for the recovery of unliquidated damages for the breach of Ives & Co.'s executory contract of purchase, which was not broken until after the day of the assignment. I accept this contention of the objecting creditors. They further submit that the claim, being for unliquidated damages, is one which, in its nature, cannot be proved against the assigned estate, and in support of this position they cite the decision of the general term of the New York court of common pleas in Re Adams, 15 Abb. N. C. 61. I have disregarded these views of the objectors so far as to receive all the testimony offered upon the question, not thereby expressing any opinion as to the effect of the proof so received. They finally say that, upon these proofs, it appears that even now Coombs, Faxon, and associates present no well-defined legal or liquidated claim against the assigned estate; and that, by their dealing with the consolidated company in October, 1887, they finally elected to abandon the claim against Ives & Co. as vendees, to reassert their unrestricted power of dealing with those shares, and to sell the same to the consolidated company.

My views on these several propositions are as follows: In re Adams, 15 Abb. N. C. 61, does not to me seem to be wholly controlling. The learned and venerable judge who delivered the opinion accurately states the conditions and reasons for rejecting proof of unliquidated claims against bankrupt and insolvent estates, as not being debts. In bankruptcy these reasons were (1) "that as the bankrupt, under the act, was to be discharged from his debts, the proceeding was to be strictly confined to what was regarded as a debt;"

and (2) that "the creditors whose claims were ascertained and fixed when the bankrupt went into or was brought into bankruptcy, were entitled to share in the distribution of this estate as soon as it was gathered in, and were not to be delayed by claims against him sounding in damages which it might take years to determine." Of course the first of these reasons has no applicability in respect of an insolvency system such as that of New York, under which no discharge is usually practicable; but that neither such reason, nor the second, resting upon the convenience of administration, are always prevalent, even in bankruptcy, appears from a consideration of express statutory provision to the contrary under the United States bankruptcy act of 1867, (Rev. St. § 5067,) and the Massachusetts statute (chapter 293, Laws 1884.) *Bowditch* v. *Raymond*, 15 N. E. Rep. 285. See, also, *Loring* v. *Kendall*, 1 Gray, 305; *In re Church*, 14 Atl. Rep. 874. Such express statutory disregard of these two reasons indicates that they are not inherently essential to proper administration in insolvency, and justifies the conclusion of the learned court that, under our system of assignments, "the question is one to be gathered from a fair construction of the instrument, and not the provisions of any statute." Finding it thus to be a question of construction, he turned to the case for a description of the assignment there in question, which was not set forth at length, and assumed it to be an assignment only "for the payment of the just debts of the assignors." This assumption I find to be correct, having personally ascertained from the record in the county clerk's office that that assignment was "to pay * * * to each and every of the creditors of the party of the first part, as such copartners, the full sum that may be due and owing to them respectively." Under such an assignment the assigned estate was clearly applicable to the payment of debts only, and not unliquidated claims for damages. But in the Ives assignment there is no such restriction to debts alone. The assignment is to pay "all debts and liabilities." Do these words, "and liabilities," extend the scope of the assignment? I think that they do. They cannot be disregarded as meaningless, or as being merely synonymous with "debts." In the case of a business situated as was that of Ives & Co., it would have been substantial injustice to appropriate the assets to the exclusion of the various equitable claims which largely affected the situation of the firm. Judge DALY points out (15 Abb. N. C. 65) that, under an insolvent statute concerning debts and demands, provision must be made for a larger constituency than under an act concerning debts only. So I hold that the term "liabilities" enlarged the scope of the Ives assignment. It is sufficient to note the excellent definition of "Liability" in Rapalje & Lawrence's Law Dictionary as follows: "The condition of being actually or potentially subject to an obligation; is used either generally, as including every kind of obligation, or in a more special sense to denote inchoate, future, unascertained, or imperfect obligations, as opposed to debts, the essence of which is that they are ascertained and certain," and to cite the decision of Judge DILLON in *Re Hook*, 2 Dill. 92. No claim, therefore, is to be excluded from my consideration merely because it is not, strictly speaking, a "debt."

Proceeding, then, to consider the Coombs claim, I find that it is for breach of contract made by Ives & Co. in aid of a railway corporation, accompanied by that corporation's guaranty for the purchase of certain stock at a certain price. I find that there was no breach of the contract until 11 days after the assignment, and that during these 11 days the assignee had the right, if he so wished, to call for the execution of the contract. *Pardee* v. *Kanady*, 100 N. Y. 121, 2 N. E. Rep. 885; Benj. Sales, § 759. I find, however, that the assignee could not then be compelled to perform this contract, (15 Abb. N. C. 70,) which at all times until after the making of the assignment was purely executory, no title to the stock passing, for payment was a condition precedent to the transfer of title. *Anderson* v. *Read*, 106 N. Y. 333, 13 N. E. Rep. 292; *Founding Co.* v. *Grant*, 114 N. Y. 40, 21 N. E. Rep. 49. I further find

that, upon the refusal of the assignee, August 23, 1887, to receive the tendered stock, there was a breach, on account of which the vendors might have proceeded against the members of the firm of Ives & Co. as follows:  (1) To hold the property for them, and to require of them payment of the entire purchase money; (2) to sell after notice to them as their agent for that purpose, and to recover the difference between the contract price and the market price at the time and place of delivery.  *Dustan* v. *McAndrew*, 44 N. Y. 72; *Mason* v. *Decker*, 72 N. Y. 595, 599.   See, also, Benj. Sales, § 758.   Had Coombs and associates chosen to proceed upon the first course above stated, I should consider their claim to recover the purchase price to be fairly provable against the assigned estate.  But Mr. Coombs distinctly declines to take this position, and asserts that the stock has been at all times, and now is, the property of himself and his associates, having gone so far in this direction that, in October, 1887, he contracted to sell the stock to the consolidated company which, as to Ives & Co., was then certainly a third party.  I therefore find that Coombs and associates have finally elected not to hold the contract stock for Ives & Co., or their assignee.  This election has been made, and is adhered to up to the present time with such unvarying persistency that it cannot be hereafter withdrawn.  *Moller* v. *Tuska*, 87 N. Y. 166.   The second course above indicated, *i. e.*, a sale after notice and a claim for difference, has also been resolutely and intentionally disregarded and rejected by Mr. Coombs, and calls for no further consideration at present.  The third course, a retention of the stock and a recovery of a difference between the contract price and the market price at the time and place of delivery, necessarily involving proof and determination as to such market price, is also rejected by Mr. Coombs, who says with considerable force that the character and condition of this stock was and is such that its market value, if anything at all, was substantially impossible of ascertainment.  This difficulty seems to be precisely that which brings the claim as now presented within the rule in *Re Adams*, 15 Abb. N. C. 61, against the consideration of unliquidated claims.  The inquiry calls upon the referee to delay all other creditors and the final ascertainment of assets and claims at this late date,—33 months after the assignment,—for the adjustment of the claim of a creditor who, during all that time, has declined and still declines to liquidate his claim in any of the methods suggested.   See *Lovenberg* v. *Bank*, 67 Tex. 440, 2 S. W. Rep. 874.   It is doubtful whether the claim is in condition for proof even under the liberal provisions of the United States bankrupt law, (Rev. St. § 5067,) where an unliquidated claim could not be proved until the damages had been assessed. *Re Clough*, 2 N. B. R. 151; *Re Smith*, 6 Ben. 187.  Ever since the breach of the contract, August 23, 1887, there has been open to Mr. Coombs and his associates the opportunity provided by section 26 of the general assignment act of 1877, (chapter 466,) and availed of in *Re Adams*, already frequently quoted, for the liquidation of this claim; but no such opportunity has been availed of.   As I understand the principles governing administration in insolvency, the assessment and liquidation of such claims for damages should be made prior to and not upon the final accounting.

Therefore, upon the whole statement and completed proofs of the claimants, I grant the motion of the assignee and the two objecting creditors, and, without receiving their opposing proofs, reject and dismiss as not enforceable before me on this proceeding the claim of John C. Coombs and associates upon the agreement of May 23, 1887.  I have been greatly interested by the subtle argument of Mr. Coombs, which I have enjoyed, though I have not wholly yielded to it.   His proposition that his position is that of a claimant for the precisely ascertained and liquidated sum of $202,512, with interest from August 23, 1887, as damages for Ives' breach of contract of purchase, accompanied by his claim of ownership of the stock with which he has assumed to deal as his own, together with his suggestion that there was no market value of the stock, might have seemed to me to entitle Mr. Coombs to pursue the

:third of the courses before indicated, viz., to recover the difference between the contract price and the nearest price at the time and place of delivery. But Mr. Coombs has at all times asserted and now asserts that he is entitled to avail himself as against others of all claims and rights of action upon the ·stock which he insists upon his right to hold without accountability therefor until he shall have been paid in full. While these certificates for 5,062.8 shares in an obsolete railroad company may be without present market value, I am not ·certain that as choses in action, taken in connection with the other proceedings and contracts, they might not become the basis of a recovery against some of these various railroad systems or funds, but whether this be or be not so is an inquiry not properly the subject of investigation in this final accounting. It is an element of the present determination that the only claim asserted by the vendor, viz., a right to the proposed purchase price of the stock, reserves all rights in respect of that stock, and declines to make any allowance on account thereof, alleging that any sum to be allowed is incapable of computation. The claim thus seems to be one not for consideration, ·especially not at this stage of the proceedings. The question is not free from difficulty, and I may have erred, but an opportunity for correction will be afforded upon the motion to confirm the report. The claim of John C. Coombs and associates for breach of the agreement of May 23, 1887, is therefore disallowed and dismissed.