## APPEAL OF THE AMALGAMATED SUGAR CO.

Docket No. 6439.    Decided July 30, 1926.

1. The consistent accounting practice of a seller of fungible goods to accrue the price fixed by its sales contracts as income in the year of the contract, when the evidence shows that all parties in the trade regard title to the goods as passing at that time and not at the time of later delivery and payment, *held* correctly to reflect income.

2. The significance of a form of contract as part of a system of carrying on business may be determined by reference to the usages by which its terms are commonly understood and interpreted by the parties themselves, and evidence of such usages *held* admissible.

3. The transfer of title is only one element in considering the consistent and fair reflection of a taxpayer's income on the accrual basis and is not always controlling. *B. B. Todd, Inc.,* 1 B. T. A. 762.

4. In considering the significance of a taxpayer's practice in accounting for goods on hand and of its "inventory" and "inventory account," the nomenclature employed must give way before a true interpretation of the facts.

5. The actual construction of a uniform contract by the parties is entitled to greater weight than the dry interpretation of the language itself by a third party.

*E. M. Bagley, Esq., R. Kemp Slaughter, Esq.,* and *Lincoln G. Kelly, C. P. A.,* for the petitioner.
*A. Calder Mackay, Esq.,* for the Commissioner.

Before STERNHAGEN, LANSDON, and ARUNDELL.

Proceeding to set aside deficiencies of $210,810.56 for the fiscal year ended February 28, 1918, and $5,453.23 for the fiscal year ended February 28, 1919, upon the ground that the Commissioner has (1) failed to recognize certain payments already made and demands duplicate payment, (2) based depreciation upon inadequate value, (3) determined invested capital by incorrectly subtracting the previous year's tax from surplus at the beginning of the year and by incorrectly reducing the earnings available for dividends in an estimated amount of income and profits taxes, and (4) improperly treated the income arising from certain contracts in respect of the sale of sugar as having accrued respectively in the years in question.

FINDINGS OF FACT.

For the fiscal year ended February 28, 1918, the petitioner paid income and profits tax of $390,044.56 and for the fiscal year ended February 28, 1919, the petitioner paid income and profits tax of $49,534.61.

The petitioner is a Utah corporation which manufactures, refines and sells beet sugar at wholesale. It has several factories and warehouses in Utah and Idaho. Throughout its existence it has kept its books and made its returns on the accrual basis. The sugar was of standard and uniform grade, quality and condition and was uniformly sold in bags of 100 pounds each.

During the fiscal year ended February 28, 1917, the petitioner's business was conducted in accordance with its general practice and the understanding of those in the trade, as follows:

Its manufacturing and refining season extends approximately from the beginning of October until the end of December. Most of the sugar is sold through brokers. The selling price is fixed by adding the freight rate to the base price at the seaboard point having the lowest freight rate to the place of delivery. The broker upon receipt of an order prepares the contract and sends copies for execution by the petitioner and the purchaser. All the parties, seller, buyer and broker, have invariably treated these transactions as absolute sales at fixed price as soon as the contract is made. None has ever been repudiated. The buyer frequently resells. In case of sale direct by petitioner without the intervention of a broker, the contract is similar and the understanding is the same. The buyer may and frequently does call for delivery of some or all of the sugar at once, either taking delivery himself or directing delivery to a customer to whom he has resold. He carries the sugar on his books as his own from the time of contract. He usually does not know or care in which particular warehouse the sugar is, or from which one delivery is made. When shipment is made an invoice is sent to the buyer for the amount shipped. When the contract provides that the buyer must take delivery within 30 days, as it usually does, or 42 days, as it does if buyer takes delivery from spot stocks, an invoice is sent to him at the end of such period, as to the quantity of the sugar of which he has not yet demanded delivery or ordered shipment. Buyer must pay the fixed contract price at the end of the contract period whether he has ordered delivery or not, and sometimes petitioner has on hand sugar paid for but undelivered. Ordinarily, the buyer does not pay until he receives an invoice. The price is fixed as to a specified destination and the buyer has no right to change the destination; nor does the contract specify the particular factory or warehouse from which the shipment is to be made. All undelivered

sugar is held by petitioner in its several warehouses or in warehouses in Missouri River territory to which some is shipped on consignment. There has always been enough sugar on hand to fulfill the orders.

The contract in use during the fiscal year ended February 28, 1917, is as follows:

AMALGAMATED SUGAR CO.

KANSAS CITY COPY

Sale No. AMAL 290 M

2-16-17

To CHERO COLA CO._____ COLUMBUS, GA. _____ Purchaser:

We confirm sale, as broker for THE AMALGAMATED SUGAR COMPANY, OGDEN, UTAH, 2500 bags Standard Fine Beet Granulated Sugar at 6 93¼ less two per cent (2%), and also less freight charges to destination. Deduction for freight to be verified by submitting the paid freight bill to seller. To be delivered F. O. B. Cars at factory of the Sugar Company, destined to EX WHSE MEMPHIS TENN

Any change in destination above stated by purchaser shall render the contract void, and give the seller the absolute right to stop the shipment while in transit and retake possession or recover from the purchaser the seller's price for sugar at the substituted destination.

TERMS: Payable in New York or Chicago exchange.

Orders for shipment of said sugar to be made by the purchaser in proportionate quantities and intervals during the life of this contract, but all to be ordered shipped SOON AS POSSIBLE FROM MEMPHIS, TENN and seller agrees to meet the purchaser's demands for shipment to the best of its ability, subject to unavoidable delays by the factory or railroad company, and subject also to all delays caused by labor strikes, fire, tornadoes, floods and earthquakes, and any event or contingency beyond the seller's control.

In the acceptance of this contract it is agreed that if specifications be not furnished within the stipulated contract period, seller is authorized to complete contract by shipment or delivery of Fine Granulated, at his convenience, soon as possible after expiration of contract date without further notice.

NO GUARANTEE

Terms, conditions or verbal agreements other than those printed above are unauthorized and will not be taken into consideration in the fulfilling of this contract.

Please sign and return promptly the attached contract covering your today's purchase; a signed contract will be forwarded you immediately by The Amalgamated Sugar Company.

Thanking you for your order as above, beg to remain,

Very truly yours,

MEINRATH BROKERAGE CO. ____ Broker.

C

TERMS—LESS 2% 7 DAYS AFTER

DATE SHIPMENT

| Lamborn | Ours | Total |
|---------|------|-------|
| 37. 50  | 37. 50 | 75. 00 |
|         |      |       |
|         |      |       |

The words "no guarantee" used in the contract are customarily understood in the sugar trade to mean that the price remains fixed and will not be changed by reason of fluctuation in market price.

The contract in use during the fiscal year ended February 28, 1919, is as follows:

SELLER'S COPY FROM BROKER.

SUGAR SALES CONTRACT

THE AMALGAMATED SUGAR COMPANY    SALE NO. ____

____ 191__

SOLD TO _____ of _____

|  | Bags | Bags | Bales 4.25's |
|---|---|---|---|
| _____ BAGS ) of 100 pounds | at $_____ | _____ | basis |
| _____ BALES ) Granulated Sugar. Plus | $_____ | ___.___ | P. P. Rate |
|  | $_____ | _____ | delivered |

Rubber stamp
" NO GUARANTEE "

AT _____ _____ _____

SHIPMENT, OR (DELIVERY from consignments) TO BE COMPLETED WITHIN 30 DAYS FROM DATE.

Delivery complete on receipt of goods by carriers, F. O. B. factory of Sugar Company, or delivery of warehouse order from consigned stock.

Any change in destination enroute by buyer shall render this contract voidable, and give the seller absolute right to stop shipment while in transit and retake possession, or recover from the purchaser, the sellers price of sugar at the substituted destination. Sellers option of routing.

Deduction for freight paid to be verified by attaching paid freight bill to remittance.

TERMS: CASH, LESS 2 PER CENT 7 DAYS AFTER ARRIVAL, Payable in New York Exchange.

CONDITIONS.

In the acceptance of this contract it is agreed that if specifications be not furnished by buyer within the stipulated contract period, seller is authorized to complete contract by shipment or delivery at its convenience as soon as possible after expiration of contract date without further notice. This contract is subject to strikes, fires, transportation and business conditions and extraneous causes which render performance commercially impracticable.

Terms, conditions or verbal agreements other than these printed above are unauthorized and will not be taken into consideration in the fulfilling of this contract.

The obligations of seller under this contract shall terminate unless buyer shall have delivered to seller, duly signed, a copy of this contract within 10 days of date.

During the fiscal year ended February 28, 1917, the taxpayer manufactured 924,516 bags of sugar, of which 411,907 were sold and actually delivered during the year. At the close of the year it had sugar sales contracts covering 190,374 bags of sugar undelivered.

During the year in question sugar sales contracts were carried on the books, in the inventory account, at sales prices. On February 28, 1917, a journal entry was made debiting "Inventoried cost of sugar

sold" and crediting "Sugar inventory" with the sum of $1,132,-744.55, said sum representing "411,907 bags at $2.75," which was the number of bags sold and actually delivered during the year. Said journal entry contained the explanation: "This leaves 512,609 bags of sugar, consisting of 190,374 bags of sugar sold under contract which will net approximately $6.25 per bag and 322,235 bags of unsold sugar at $6.25, the fair market net at this date."

The taxpayer maintained a sales memorandum during the year in question which served also as a perpetual inventory of sugar stocks on hand. Daily entries were made recording all additions made to the stock, and the inventory was reduced by the aggregate of all sales contracts made during the day, whether for immediate or future delivery. Sugar not covered by sales contracts at the close of the year was included in the inventory at cost of manufacture. The sugar covered by sales contracts but not delivered was included in the inventory at sales price.

Commissions were credited to brokers' accounts at the same time invoices were rendered to customers against shipments, though at the close of the year commissions were anticipated and entered on the books in respect of unfulfilled contracts. The broker would send no bill for commissions but the parties customarily regarded him as entitled as soon as the contract was signed. The commission is treated and accounted for by petitioner as an expense of the year in which the contract is made and included as a deduction in its tax returns of that year. Allowances to customers for freight charges which they would pay for future shipments under unfulfilled contracts were entered on the books at the close of the year.

The sugar covered by sales contracts at February 28, 1917, but undelivered at that date, was invoiced to customers, either by the company or its brokers, during the fiscal year ended February 28, 1918, at the prices stipulated in the contracts, irrespective of any rise or fall in market prices prior to completion of deliveries. When these invoices were made to customers, accounts receivable was charged and sugar sales account was credited with the respective amounts thereof. At the close of the fiscal year 1918 a journal entry was made eliminating the aggregate of these invoices from the sales of the year 1918.

For the fiscal year ended February 28, 1919, the same policy of accounting within the year for income from unfulfilled sales contracts was followed, though the accounting differed slightly from that employed in the fiscal year ended February 28, 1917. For the fiscal year 1919 the company set up an account known as "Sales Contracts Receivable." to which it charged the amounts of its sales contracts as and when those contracts were received, a corresponding

credit being made to the sales account. The gross sales of the company for the fiscal year 1919, as shown on the books of account, included the aggregate of all sales contracts, whether the sugar had been delivered or not.

Commissions to brokers and allowances to customers for freight charges were handled on the books during the fiscal year 1919 precisely as they were handled for the fiscal year 1917.

In respect of sugar covered by contracts, the petitioner assumes the storage and insurance until the expiration of the contract. The insurance policies contained a provision substantially as follows:

On sugar and sugar in process of manufacture (finished or unfinished), including sugar bags and packages, empty or otherwise, and Beet Seed, but excluding all other merchandise and supplies of every description, their own and/or on consignment, and/or sold, but not delivered or removed, and/or held for charges or advances, and/or held or owned on joint account with others, and/or for which the Assured has assumed or shall assume liability, all contained in buildings known as Main Buildings and/or "Warehouses" and/or "Storerooms" at the Assured's plants, and/or in and/or on platforms, sheds and/or cars within 300 feet thereof.

It is hereby understood and agreed that property insured hereunder may be pledged as collateral without prejudice to this insurance and that the same may be warehoused in the names of brokers or agents of The Amalgamated Sugar Company, this insurance to cover the interests of all parties therein.

This policy covers whilst at the risk of the Assured from and to any place within the United States of America either during period of transit, or whilst on storage, or whilst passing through the premises of Assured at its plants in the States of Utah and Idaho.

The market price of sugar advanced between the time of contracts made in February, 1917, covering the 190,374 bags of sugar and the time of delivery thereof.

In its tax return the petitioner treated the contract price of the 190,374 bags of sugar as income accrued in the fiscal year ended February 28, 1917. The Commissioner treated it as income accrued in the fiscal year ended February 28, 1918. He thus reduced petitioner's 1917 income and sent the petitioner a check for refund of over $50,000. The petitioner has not acquiesced in such adjustment and has not accepted the check.

The petitioner did not set up on its books in or for the fiscal year ended February 28, 1917, or February 28, 1919, any amount to cover income or profits tax for those respective years or a reserve for such taxes. The 1917 taxes were entered on the books when paid in 1918 and the 1919 taxes when paid in 1920. The Commissioner computed invested capital for 1918 and 1919 by reducing earned surplus at the beginning of the year by the amount of the tax for the previous year and also treated the amount available for dividends as reduced by the tax.

OPINION.

STERNHAGEN: The Commissioner has conceded that the petitioner has paid the amounts of taxes set forth in our findings and that adjustment of the deficiency will be made accordingly. He also confesses error as to the basis of depreciation. To these two issues originally raised by the pleadings we need give no further attention.

The third point of the petitioner is that invested capital has been reduced by taking from the opening surplus the tax for the year just closed and by taking from earnings available for dividends the estimated tax for the current year. Since the hearing the law, as held in *Guarantee Construction Co.*, 2 B. T. A. 1145, has been changed by the enactment of section 1207 of the Revenue Act of 1926, which in effect approves a computation of invested capital made in accordance with the Commissioner's regulations in so far as it is affected by the tax of the preceding year. The validity of such a computation is therefore no longer open to question. *Russel Wheel & Foundry Co.*, 3 B. T. A. 1168. This section does not, however, affect the question of reducing the earnings available for dividends by the estimated amount of taxes for the current year, which was decided adversely to the Commissioner in *L. S. Ayers & Co.*, 1 B. T. A. 1135, upon the authority of which the petitioner's claim in this respect is sustained.

The fourth point has been vigorously tried, although we are without a brief for the Commissioner and can not therefore be certain of the grounds and authorities upon which his determination rests. During the fiscal year 1917 the petitioner manufactured and sold sugar and its business was carried on in all respects in its customary manner. There was nothing unique in this year and the facts may be regarded as those of a normal year of business operations. The evidence upon which the facts are found was all elicited from petitioner's witnesses—its own employees, buyers of many bags of sugar for many years, and the broker who for thirty years had negotiated the sale of much of the beet sugar of the country. The Government produced no witnesses. Despite vigorous cross examination these witnesses, representing all sides of the sugar trade, presented a clear and consistent description of the business and all agreed upon its salient features.

This taxpayer is one of the principal beet sugar producers in the United States. It has carried on its business for many years and in that time it has not only established a substantial volume of trade but has established uniform customs and practices recognized by all those with whom it has transacted its business. These customs and common understandings are accepted as part of all its transactions. We have admitted all evidence of such customs because it has seemed

pertinent and worthy of consideration. To exclude it from any consideration whatever, and thus to say that it has no probative value, would be entirely unwarranted, for we should be construing contracts and giving regard to general business practices and at the same time leaving out of consideration matters which all the parties thereto regard as inherent in them. It seems clear that, whatever may be said of the weight of such evidence as part of the whole record, and even although it should be found to have but little significance, this would not justify its entire exclusion from the case. The petitioner introduced in evidence a typical contract covering its sales as bearing upon the question when the stipulated price accrued and offered *aliunde* evidence of customs and usages by the aid of which the contract should be construed. This was objected to as incompetent for the reason that the contract could only be construed according to its literal terms. For example, it was argued by the Government that oral testimony of the commonly accepted meaning of the words " no guarantee " appearing in the contract could not be received. The objection, we think, is not well founded, not only because the words are not self-explanatory and of clear and single meaning, but upon a more general ground. Let it be conceded that there may be cases where a single contract, being the subject of litigation, must be construed according to its letter; still we are here dealing not with the disputed rights of the parties to such a specific agreement but with the methods and accounts of a corporation and the extent to which they are affected and illustrated by its uniform contract. The contract itself is only part of its system of doing business, and whether the customs and usages be regarded only as elucidating the contract or as elaborating the description of the system, it seems clearly admissible for the light it may throw upon the general question of accrual accounting. Since the rule is that even a particular written instrument may be explained and interpreted, as against the Government not a party to it, by extraneous evidence, *Converse & Co.*, 1 B. T. A. 742; *J. W. Solof*, 1 B. T. A. 776; *a fortiori*, the significance of a form of contract as part of a system of carrying on business may be determined by reference to the usages by which its terms are commonly understood and interpreted by the parties themselves.

The defense of the Commissioner was founded in great measure upon the argument that the sugar contracted for in February and not delivered until the following year was not sold until delivery—that title did not pass to the buyer until the following year—and hence that the contract price could not be treated as accrued income within the contract year or until title passed. Upon the question of time of passing of title most of the argument has centered, the petitioner's brief containing .elaborate discussion and a wealth of

citation. We have considered this and have examined the books at some length, and we are impressed with the realization that however we may decide the question of title generally it must still remain open in respect of the rights of the parties under any particular contract. Our task goes only so far as to determine whether, under the Revenue Act of 1916 and the Revenue Act of 1918, this taxpayer has, upon an alleged accrual basis, properly returned its income for the years in question. The former Act, section 13 (d), is as follows:

A corporation * * * keeping accounts upon any basis other than that of actual receipts and disbursements, unless such other basis does not clearly reflect its income, may, subject to regulations made by the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, make its return upon the basis upon which its accounts are kept, in which case the tax shall be computed upon its income as so returned.

Section 212 (b) of the 1918 Act is as follows:

The net income shall be computed upon the basis of the taxpayer's annual accounting period (fiscal year or calendar year, as the case may be) in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; but if no such method of accounting has been so employed, or if the method employed does not clearly reflect the income, the computation shall be made upon such basis and in such manner as in the opinion of the Commissioner does clearly reflect the income. * * *

The matter under these statutes, it will be seen, is not one only of the correct legal construction of each individual contract made by a taxpayer, which in any event could by this Board be only tentative; but one of consistent and fair reflection of the taxpayer's annual income. As to this, the title is only one element, which may not always be controlling. In *B. B. Todd, Inc.*, 1 B. T. A. 762, the Board held that the sales price was accrued income under a uniform contract expressly providing that title remained in the vendor with a right to repossess for nonpayment. In the instant case all the parties testify to an intention to pass title at the time of execution of the contract, and there is nothing in the instrument itself indicating otherwise. Rather does the form of the instrument use words of immediate sale, such as " sold " or " we confirm sale," and the sanction of the accrual method given in the *Todd* case may not be readily withheld here except for reasons other than the time of sale.

But an examination into the question has led us to conclude that in the usual sale by this corporation title passes and the sale is complete when the contract is executed. The passing of title must be determined from the evidence. It is not a question which can be dogmatically answered. The primary factor is the manifest intention of the parties to any given transaction. *Hatch* v. *Oil Co.*, 100 U. S. 124.

The evidence shows that petitioner's product is in all respects uniform and is so sold. The rules in respect of sales of fungible goods are applicable. It appears that the goods have in all cases been in existence at the time of contract and that fulfillment of the contract has never failed. Delivery is always made by the seller upon demand of the buyer. The quantity sold is always part of a greater quantity owned by the seller, although the sugar from which the sale is made may be in one or all of several factories or warehouses located in different places in Utah and Idaho, or elsewhere. The location of the particular sugar is not specified for it is a matter of complete indifference to the buyer, who is concerned only with delivery at the prescribed destination.

All of the parties to the greater number of petitioner's sugar sales for many years—the seller, the buyers, and the leading broker— testify that they have uniformly regarded and treated the sale as complete when the contract is executed. The buyers say "The sugar is ours"; the broker calls the contract a "positive sale," and all act consistently with this idea. All account for the sugar on their own books as though ownership were transferred. The seller and broker account for a commission fully earned, and the seller treats such commission as an immediate expense and deducts it on its return for the year of the contract. The buyer inventories the sugar as its own or resells immediately and gives delivery instructions to the seller.

And the petitioner's accounting is entirely consistent with the concept of immediate sale. Unfortunately for the requirements of this case, the petitioner included the sugar sold and undelivered in a so-called "inventory account." The word "inventory" in this connection has provoked much of the dispute because it has caused the Government to reason that the inclusion of the sugar in "inventory account" connotes a recognition of continuing owership, which is inconsistent with an intention to pass title to another. But the reasoning does not withstand analysis, since it leaves out of consideration the facts and circumstances of petitioner's accounting system which indicate that its so-called "inventory account" is quite different from a simple inventory. There is a confusion arising from the accounting nomenclature employed and this must always give way before a true interpretation of the facts. In its perpetual inventory, revised daily to advise the management of the current state of affairs, appears the sugar on hand, that part contracted and that available for sale. Its copies of contracts are kept as the original record of sales and its copies of invoices as the original record of sales deliveries and accounts receivable. Thus account is taken currently of the true situation. The financial situa-

tion is recorded by including sold but undelivered sugar in the inventory at sales price and the unsold sugar at manufacturing cost. The effect of this is to raise the valuation of closing inventory and thus include the sales profit in gross income. It is not enough under these circumstances to say that the amount of sugar on hand is included in inventory or inventory account. In order to learn the significance of this in determining income, the pricing of the inventory must be considered and the method of accounting for it financially. It is only when translated into their money equivalent that goods on hand may affect the profit and loss statement from which taxable income is determined, and the effect of entering contracted sugar at sales price is the same as if it were taken from inventory and the sale price included in gross sales. This effect is to treat such price as accrued gross income. This was the petitioner's way of expressing its interpretation of the contracts as passing title in the goods to the buyer and establishing in itself an account receivable.

This uniform recognition by all directly concerned of an intention to transfer title is strong evidence to support such transfer. We do not understand that in any case where the parties themselves intend and agree to pass title without possession the law will refuse to recognize such deliberate agreement, irrespective of whether the goods be specific or fungible. See Williston on Sales (2d ed., 1924), section 146, et seq.; Mackellar v. Pillsbury, 48 Minn. 396; 51 N. W. 222. The actual construction by the parties is always important, Roberts v. Tuttle, 36 Utah, 614; 105 Pac. 916, and is clearly entitled to greater weight than the dry interpretation of the language itself by a third party. As we understand the Government's contention, it is that, as a matter of law, no title could pass because the location of the goods was not specified, and that even although the goods be fungible there is still not a sufficient identification because there is no specification of the particular greater quantity or mass from which the delivery is to be made. We do not find the law so rigid. In 24 R. C. L. 29, Sales §291, the following statement appears:

But where a certain number of bushels of grain are sold to be taken from a larger mass, it has been held that if the acts and declarations of the parties clearly evince an intention to make an immediate transfer of title, effect will be given thereto, though there is no actual segregation of the part sold from the larger mass which is and remains in the actual possession of the seller.

The rule in Minnesota is expressed in Mackellar v. Pillsbury, supra, as follows:

Where a certain number of articles are sold out of a greater number of exactly the same kind and quality, with the intention that the title should presently pass, and where the vendee has the absolute right at any time to take the amount or number out of the whole mass or quantity, this is sufficient

to pass the title, although the specific articles are not actually designated or separated from the remainder. Under such circumstances, until the separation is made the vendor and vendee are tenants in common of the whole according to their respective interests.

In *Gourd* v. *Healy*, 206 N. Y. 423; 99 N. E. 1099, it was held that wine sold in New York by description out of a larger quantity in cellars in Bordeaux, France, could be treated in respect of the passing of title precisely the same as though the wine had been in the vendor's cellar at the time of the contract, and the buyer was held liable.

Reliance is placed by respondent upon the fact that the vendor insures the goods while in its possession. But title is not controlled by the assumption of the risk of loss or damage. And furthermore, the policy of insurance introduced in evidence covers the interests of all parties in the goods insured, thus taking care of the situation as to such sugar as may be under bailment.

It is also urged that the rule as to fungible goods does not apply unless the larger mass is identified as in a specified location, and that since, in the instant case, there may be sugar of the seller in many places from which the contract may be fulfilled title can not pass at least until designation of the mass. No authority for this is cited and no reason is given to support it. In the leading case of *Kimberly* v. *Patchin*, 19 N. Y. 330; 75 Am. Dec. 334, the larger mass was in two piles and the rule was nevertheless laid down. There is no doubt that tenancy in common may exist whether the aggregate property of all be in a single mass or in several masses and without regard to the size or proximity of the masses. And, since the American rule of transfer of title is founded in the law of tenancy in common, there would seem no reason why it may not be applied where the masses are separated.

Our attention is directed to *Haas Bros.*, 3 B. T. A. 113, as supporting the Government's position here. That was an appeal of a buyer under certain specific contracts covering respectively several kinds of groceries and requiring construction under a California statute prescribing identification as a condition of transfer of title. The goods were not identified and in some cases not in existence. In each instance the contract expressly provided that something remained to be done before the buyer was bound and, unlike this case, there was no evidence of intention of all parties that title should pass. The buyer there, like the Government here, sought to prove from the bare words of the contracts themselves that, as a proposition of law and irrespective of actual intent, the title was in him and should be included in his inventory at cost or market whichever was lower. Under the law of California this was not established. That decision is not determinative here. The cases are different and both may stand without conflict.

But concluding as we do that title to the sugar left the seller contemporaneously with the execution of the contract, we repeat for the purpose of emphasis that this is but one consideration when we are called upon to pass upon the taxpayer's accounting system and say whether it clearly reflected income. The uniform and unquestioned practice of the taxpayer was to regard these contracts as reflecting income. Its customers so regarded them. Its balance sheets treated the price among its assets. This is a consistent basis for accrual and we think it may not be denied on the questionable if not definitely incorrect ground that title remained in the seller.

The petitioner is entitled to judgment on all the issues raised, except that as to the invested capital the tax of the previous year should be treated in accordance with section 1207 of the Revenue Act of 1926.

> Order of redetermination will be entered on 20 days' notice, under Rule 50.

PHILLIPS, concurring: It is a basic principle of the law of sales that, regardless of the purported intention of the parties, no title can pass unless the subject of the sale is ascertained. In *Kimberly v. Patchin*, 19 N. Y. 330, it is said:

> It is a rule asserted in many legal authorities, but which may be quite as fitly called a rule of reason and logic as of law, that in order to an executed sale, so as to transfer a title from one party to another, the thing sold must be ascertained.

The Uniform Sales Act, enacted into law in several States and asserted to be a codification of the common law as expressed in the decisions of the majority of the state courts, provides:

> Section 17.—Where there is a contract to sell unascertained goods no property in the goods is transferred to the buyer unless and until the goods are ascertained, but property in an undivided share of *ascertained goods* may be transferred as provided in section 6.

> Section 6.—* * * In the case of fungible goods, there may be a sale of an undivided share of a *specific mass*, though the seller purports to sell and the buyer to buy a definite number, weight or measure *of the goods in the mass*, * * *. (Italics mine.)

In 35 Cyc. 293–295, it is said:

> Where the sale is of a part of a *specific mass* the constituents of which are identical in kind, quality, or value, selection is of course unnecessary, * * *. The general rule and that which seems to be supported by the weight of authority is that even when the constituents of the mass are of the same kind, quality, and value, the property in any portion thereof will not pass by a contract of sale unless the portion has been identified by separation. On the other hand there is a line of well considered cases in which the intention of the parties is regarded as the controlling factor, and the rule is laid down that, although the goods sold have not been separated from the mass, the property therein will pass if such was the intention of the parties, * * *.

The contract of sale may relate *to goods of a particular description but not part of a specific mass,* * * *. Under such contracts the property in the goods does not pass to the buyer until there has been appropriation of specific goods to the contract.   (Italics mine.)

In *Hatch* v. *Oil Co.*, 100 U. S. 124, the Supreme Court said:

Sales of goods not specified stand upon a different footing, the general rule being that no property in such goods passes until delivery, because until then the very goods sold are not ascertained.

Granting the most liberal interpretation possible to the so-called "elevator cases," which hold that title to fungible goods may pass without separation from the mass of which they are a part, nevertheless, it seems necessary that to constitute a sale there must be some specification or identification of the particular mass of which the goods sold are a part; otherwise, we have merely a sale of goods by description which may be performed by delivery from any source of the goods described.

An examination of the findings of fact leads me to the conclusion that in the instant appeal we have a sale of goods by description, which sale could be performed by delivery from any source, and that the contract, so far as the findings show, did not relate to any specified mass from which the subject of the sale was to be taken. Certainly the contract does not itself refer to any specified goods or mass of such goods. It appears that, at the time of the sale, the seller did have at hand sufficient goods to perform the contract, but so far as the purchasers are concerned there is no showing that they were aware of this fact or contracted with reference thereto or with reference to such goods. Possibly, if the parties had argued that the sugar sold was part of the stock owned by the seller, wherever situated, this might be a sufficient sale of a *pro rata* portion of all such sugar, but upon this point we are not called upon to express our opinion, since there is no showing that the contract was made by the parties with reference to such ownership. Apparently the purchasers did not know or care whether they were purchasing a part of any sugar then in the possession of the seller or sugar thereafter to be acquired by it.

The legal effects which follow a sale by description are different from those where identified goods are sold. For example, where a description is the means provided for identifying the goods which are the subject of the contract, if the goods are not like the description no title passes though the parties purported to make an executed sale. On the other hand, if the parties purport to make an executed sale and the goods are identified as being those to which the contract related, title would pass even though the goods do not meet the description. In the present instance, what would the situation have been if it had developed that the sugar owned by the

seller at the time the contract was made did not meet the description in the contract? I can not believe that the courts would say the the contract had reference to the sugar owned by the taxpayer and that title passed because of that fact. Rather am I inclined to believe that they would hold that the contract referred to sugar by description, that it had no reference to what was in the hands of the seller, and that the seller was bound to deliver, not a portion of his stock on hand, but sugar of the grade required by the contract.

There has been no citation of any authority tending to show that title can pass to goods which are not either specific or part of a specified mass. On the contrary, in each case cited the mass from which the goods were to be taken was specified. In *Kimberly* v. *Patchin*, *supra*, 6,000 bushels of wheat were sold from two piles containing a greater quantity. In that case the court said:

Where the quantity and *the general mass from which it is to be taken are specified*, the subject of the contract is thus ascertained, and it becomes a possible result for the title to pass, if the sale is complete in all its other circumstances. (Italics mine.)

But in the instant case the general mass from which it is to be taken is not specified.

In *Mackellar* v. *Pillsbury*, 48 Minn. 396; 51 N. W. 222, the court thus states the case:

Cottrell had then on hand in his warehouse between 13,000 and 15,000 Brazilian barrels, and * * * he executed to plaintiff a bill of sale of 12,384 *of these barrels.* (Italics mine.)

In *Gourd* v. *Healy*, 206 N. Y. 423; 99 N. E. 1099, the goods sold were identified as part of a larger quantity in the cellars of Schroeder & Schyler, Bordeaux.

In *Pope* v. *Allis*, 115 U. S. 363, the Supreme Court said:

When the subject-matter of a sale is not in existence, or not ascertained at the time of the contract, an undertaking that it shall, when existing or ascertained, possess certain qualities, is not a mere warranty, but a condition, the performance of which is precedent to any obligation upon the vendee under the contract; because the existence of those qualities being part of the description of the thing sold becomes essential to its identity, * * *.

In *American Hide & Leather Co.* v. *Chalkley & Co.*, 101 Va. 458; 44 S. E. 705, the question was whether title to certain hides had passed so that the plaintiff could maintain an action for the sales price or must sue for damages for breach of the contract. The court said:

The contracts were for the sale of non-specific hides, being agreements merely to sell hides of a particular description. But the specific hides upon which the contracts were to operate had not been agreed upon, and the rule in such case is that the property in the goods does not pass until an appropriation of the specific goods has been made, with the assent of both seller and buyer.

It did not appear in that case whether at the time of the sale the seller had on hand sufficient hides to fill the contract, nor does the court inquire. Whether the hides were on hand makes no difference, for the contract was with reference to hides of a certain description and not hides of a certain ownership, and so in the instant case.

In the instant case it does not appear where the contracts were consummated or where the goods were located which it is claimed were sold. Under these circumstances, we might be justified in applying to the contracts the most unfavorable construction possible under the laws of any State, but it seems preferable to make use of those principles of the law of sales which have most general application throughout the United States. The general rule, as I conceive it, is laid down in *Kimberly* v. *Patchin, supra,* and in *Anderson* v. *Read,* 106 N. Y. 333; 13 N. E. 292, where the same court says:

The other fact is that there is in the contract no specification, identification or description of the particular property sold. It was simply 1,000 tons of superphosphates. Where the goods were is in no way designated or intimated. They might have been in Europe, New York, Georgia, or (as was the truth), not *in esse,* and still every word of the contract have full significance. How is it possible to say that the title to any particular superphosphate passed to the vendee when there is no description or identification of it to be found in the contract, or any reference to it therein made? Suppose the vendors had had 1,000 tons of the goods in their factory in New York, and that after the signing of the contract, a fire had totally destroyed the factory and its contents, who would have had to sustain the loss of such goods? Is there the least ground for claiming that the vendees must suffer it? Make the same supposition, but place the goods at Atlanta, and the same question arises and the same answer must be given. As is said by Comstock, J., in *Kimberly* v. *Patchin,* (19 N. Y. 330, at 333): " It is not only legally but logically impossible to hold property in such things unless they are ascertained and distinguished from all other things, and this, I apprehend, is the foundation of the rule that, on a sale of chattels, in order to pass the title, the articles must, if not delivered, be *designated* so that possession can be taken by the purchaser without any further act on the part of the seller." This was said in a case where the question arose as to the transfer of title to a quantity of grain, a part of a larger quantity in a warehouse, which was designated and identified, and this court held the title passed on the execution of the contract. But when a quantity of oil was sold out of a stock consisting of different large quantities in different cisterns, and at various warehouses, and the note of sale did not express the quality or kind of oil sold, or the cistern or warehouse from which it was to be taken, and the purchaser did not even know where the particular oil lay which was to satisfy the contract, the court held the title did not pass (*White, Assignee* v. *Wilks,* 5 Taunt. 176), and that case is cited with approval in *Kimberly* v. *Patchin (supra).*

In *Davis* v. *Budd,* 60 Iowa, 144; 14 N. W. 211, where the contract involved the sale of corn of a certain description, the court said:

The question presented is as to whether the corn which the defendant had on hand to the amount of one thousand six hundred bushels, the amount

called for by the contract, was held from May 20 to July 20 at the plaintiff's risk, so far as damage from heating was concerned. In considering this question we shall assume, as the evidence tends to show, that there was no lack of care on the part of the defendant. But conceding that he bestowed proper care, we have to say that we think that the risk was not on the plaintiff. The contract is executory. No sale of corn took place. The defendant seems to think otherwise. His defense must be regarded as based upon the theory that, though the contract does not call for a specific lot of corn, nor part of a specific mass, the fact that he had a mass of corn on hand of over one thousand six hundred bushels, the amount called for, and of the requisite quality, and offered to make a delivery of one thousand six hundred bushels from the mass, had the effect to transfer to the plaintiff the title to that amount, and to impose upon him all risk of damage to such corn from heating.

Whether, if the contract had called for a part of a specific mass, the title to such part could under the circumstances be deemed to have passed, we need not determine. As tending to show that the title could not be deemed to have passed, see *Scudder* v. *Worster et al.*, 11 Cush., 573. As tending to show that it might, see *Chapman* v. *Shepard*, 39 Conn., 413, and *Waldron* v. *Chase*, 37 Maine, 414. Whatever the true rule may be upon this question, it seems to be conceded that title to part of a mass does not pass before severance, unless the contract relates specifically to such mass.

In the case at bar the contract called merely for corn of a specific quality, and could be performed by the delivery of any corn whatever of such quality.

Unless we are to read into the findings of fact something which is not there, and say, because the seller had on hand a sufficient quantity of goods to perform his contract, that it necessarily follows that the contract related to those goods which were on hand, regardless of the knowledge or intention of the buyers, we must hold that there was no sale of any specified goods, or part of any specified mass of such goods, and that no title passed.

On the facts stated it is impossible to distinguish the contracts of sale here involved from those occurring daily where goods are sold for future delivery, the contracts being entered into without regard to the source from which the goods are to come or to the ownership or lack of ownership of such goods by the person who. " sells."

I am satisfied, however, that the taxpayer has established an accounting practice which was consistent and reflected its income. Where such is the case, legal theories should not be applied to a point where, in such a case as we have here, it becomes necessary for the taxpayer to determine at his peril when legal title passes under each contract into which he may have entered. The refinements of the law must sometimes give way to practical considerations, and this I conceive to be the intent of section 212 (b) of the Act.

The instant case impresses me as proper for the application of the section, and I therefore concur in the result which has been reached.